NO. 16-60118

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

# DECLARATIONS IN SUPPORT OF SIERRA CLUB AND NATIONAL PARKS CONSERVATION ASSOCIATION'S RESPONSE IN OPPOSITION TO THE MOTIONS TO STAY THE FINAL RULE

---

**Declarant** **Page**

Bullard, Robert ("Bullard Decl.") ........ DEC 1

Caballero, Elsa ("Caballero Decl.") ........ DEC 9

Gray, H. Andrew ("Gray Decl.") ........ DEC 17

Hladik, Johnathan ("Hladik Decl.") ........ DEC 23

Miller, Nathan ("Miller Decl.") ........ DEC 26

Rábago, Karl R. ("Rábago Decl.") ........ DEC 33

Schlissel, David ("Schlissel Decl.") ........ DEC 52

Thurston, George ("Thurston Decl.") ........ DEC 80

Verma, Vikas ("Verma Decl.") ........ DEC 91

# DECLARATION OF ROBERT BULLARD

I, Dr. Robert Bullard, declare as follows:

1.      I am the Dean of the Barbara Jordan-Mickey Leland School of Public Affairs at Texas Southern University in Houston, a position I have held for the past four years. I have held teaching positions in the environmental justice field at Clark Atlanta University; the University of California, Los Angeles; the University of California, Riverside; and at the University of Tennessee, among other academic positions. My academic career spans nearly forty years. I have been a scholar and a civil rights and environmental justice advocate for almost four decades, and have been described as the "father of environmental justice."

2.      I hold a Ph.D. in Sociology from Iowa State University, an M.A. in Sociology from Atlanta University, and a B.S. in Government from Alabama A&M University. I am a member of the American Sociological Association and the American Public Health Association.

3.      I have authored numerous books and journal articles on environmental racism, industrial facility siting, climate justice, disaster response, sustainable development, smart growth, urban land use, housing, transportation equity, community reinvestment, and regional equity. In 1991, I played a key role in organizing the First National People of Color Environmental Leadership Summit,

which adopted the seventeen "Principles of Environmental Justice" that have served as a defining document for the growing grassroots environmental justice movement. In my capacity as chair of the Health and Research Subcommittee of the National Environmental Justice Advisory Council ("NEJAC"), I was part of the team advising President Clinton in 1994 to sign the historic "Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," which requires every federal agency to assess any disproportionate impacts from their actions on minority, low-income, and indigenous communities.[1]

4. I have also testified as an expert witness and served as a technical advisor in hundreds of civil rights lawsuits and public hearings over the past three decades. As a result of my extensive career as an environmental justice academic and advocate, I am personally familiar with the facts stated in this declaration and, if called upon, would competently testify to them.

5. The purpose of this declaration is to provide information relevant to motions for a stay of the Environmental Protection Agency's ("EPA's") regional haze rule for Texas and Oklahoma, 81 Fed. Reg. 296 (Jan. 5, 2016). Charles

[1] Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, February 16, 1994, available at http://www2.epa.gov/laws-regulations/summary-executive-order-12898-federal-actionsaddress- environmental-justice .

O'Neal, the President of the Texas Association of African America Chambers of Commerce and a declarant for the Petitioner utility companies, asserts that EPA's regional haze plan for Texas and Oklahoma will have "irreparable" and "lasting" impacts to the Texas business community, and the African American business community in particular. O'Neal Decl. ¶¶ 15-18. Citing a Houston Chronicle editorial (attached as Ex. A to this declaration), Mr. O'Neal asserts that EPA's rule creates a "stigma" of haze pollution in Texas, which harms the development of African American businesses and perpetuates "misplaced concerns" about public health issues associated with pollution. O'Neal ¶¶ 19-20. Mr. O'Neal further suggests that "without large coal-fueled generation available, Texas would become a less attractive place to conduct business," and as a result, the Chamber of Commerce "will struggle to incentivize the growth of new African American businesses . . . due to the possibility that they will be unfairly targeted in future regional haze actions that single out Texas businesses." O'Neal ¶¶ 16, 18.

6.    Based on my years of working with minority groups, it is my opinion that Mr. O'Neal's views do not represent those of the majority of African-Americans or the African-American business community at large. African-Americans have been an essential force in the creation of the United States' environmental justice movements, because our communities have historically been disproportionately affected by harmful pollution from industrial sources, including

electric power plants.  Contrary to Mr. O'Neal's assertions, a stay of EPA's regional haze clean-up plan for Texas and Oklahoma would create significant and long-lasting harm to African-American communities.

7.     As an initial matter, Mr. O'Neal's declaration implies that African-American communities and businesses reject clean air safeguards.  In fact, the opposite is true.  Several of our most prestigious organizations and institutions, including our civil rights organizations, such as the National Association for the Advancement of Colored People ("NAACP") and the Little Village Environmental Justice Organization ("LVEJO"), our churches and faith-based groups, and our historically black colleges and universities are at the forefront of the fight for environmental and energy justice.[2]

8.     The environmental justice movement has made much progress during the more than two decades since Executive Order 12898 has been in effect.[3] Today, hundreds of environmental justice treatises cover a wide range of disciplines; environmental justice curricula are available in every college in the country; there are dozens of environmental justice research centers and clinics in

---

[2] *See, e.g.*, National Association for the Advancement of Colored People, et al., Coal Blooded. Putting Profits Before People, *available at* http://www.naacp.org/page/-/Climate/CoalBlooded.pdf .

[3] Robert Bullard et al., Environmental Justice Milestones and Accomplishments: 1964-2014, Barbara Jordan-Mickey Leland School of Public Affairs, Texas Southern University, February 2014.

universities; and all 50 states and the District of Columbia have established environmental justice legislation, regulations or policies. A growing number of scholars, policy analysts, and community leaders are demanding that environmental justice be made a centerpiece of energy policies.

9.     Despite these successes, much work remains to be done.  Research shows that race and place impact quality of life.  Zip codes continue to be one of the most important indicators of an individual's health, and race is the most important predictor of locally unwanted land uses.[4]  In Texas, as in many areas of the country, the most vulnerable populations suffer the most damaging impacts of air pollution given where they live, their limited incomes, and their lack of access to health care.

10.     EPA's regional haze clean-up plan for Texas and Oklahoma provides an important and historic opportunity to remedy the impacts of harmful sulfur dioxide pollution to disadvantaged Texas and Oklahoma communities.  Sulfur dioxide pollution causes numerous harmful human health and environmental effects, including decreased lung function, increased asthma attacks, and respiratory and cardiovascular morbidity.  Children and adults with asthma are particularly at risk for adverse health effects.  Sulfur dioxide also reacts in the

---

[4] Robert Bullard et al., Environmental Health and Racial Equity in the United States Building Environmentally Just, Sustainable, and Livable Communities, American Public Health Association, 2011.

atmosphere to form fine particulate matter that can worsen respiratory diseases, aggravate heart disease, and lead to premature death. Coal-burning power plants are, by far, the largest source of sulfur dioxide emissions in Texas.

11. EPA's regional haze plan for Texas and Oklahoma will save lives. As I understand it, the rule will reduce sulfur dioxide pollution by 230,000 tons a year. As demonstrated by the health benefits report and supporting declaration of Dr. George Thurston, cleaning up sulfur dioxide pollution from the fifteen coal-burning power plants subject to EPA's plan will avoid more than 300 premature deaths; more than 30,000 asthma or respiratory attacks; hundreds of emergency room visits, and more than 50,000 lost work days each and every year.

12. EPA's regional haze plan's numerous benefits will affect minority and urban communities in particular. In 2014, African Americans in Texas were more than two times as likely to die from asthma-related causes than whites.[5] African-American children are nearly four times more likely to be admitted to the hospital for asthma, as compared to white children.[6] Urban communities like the Dallas Fort Worth area, which is directly affected by pollution from several of the power

[5] Texas Dep't of State Health Servs., 2014 Texas Asthma Burden Report at 20 (Dec. 2014), https://www.dshs.state.tx.us/asthma/pdf/2014BurdenRpt.doc.

[6] *Id*. at 28.

plants subject to the regional haze rule, has more than twice the overall prevalence of asthma than the state average.[7]

13. Consequently, a stay of EPA's regional haze plan for Texas and Oklahoma would disproportionately harm African-American and other urban communities. To the extent that a stay leads to a delay in the rule's compliance period, African-American communities will continue to be harmed by the health impacts of the sulfur dioxide pollution from the coal-burning power plants subject to the rule.

14. Moreover, contrary to Mr. O'Neal's assertions, there is no credible evidence that EPA's regional haze clean-up plan for Texas and Oklahoma will harm African American businesses. It is my opinion that the opposite is true. In addition to the health benefits described above, it is my opinion that clean air that is safe to breathe is a benefit to African American businesses and others. Haze pollution not only negatively impacts public lands and public health, but all of the private lands and businesses in between. Cleaning up haze pollution will improve the economy and tourism, and will therefore improve African American business prospects in Texas.

15. For the foregoing reasons, I believe that a stay of EPA's regional haze plan for Texas and Oklahoma is unjustified and would be harmful to the public

---

[7] *Compare id*. at Fig. 1-3 *with* Fig. 1-6.

interest, and the interest of African American, minority, and urban communities in particular.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4 day of April, 2016.

Robert Bullard, Ph.D.

# DECLARATION OF ELSA CABALLERO

I, Elsa Caballero, declare as follows:

1. I am the President of the Texas Local of Service Employees International Union ("SEIU"). SEIU is a labor union with more than two million members in the United States, Puerto Rico, and Canada. More than half of SEIU's two million members work in the health care industry, including doctors, nurses, nursing assistants, therapists, technicians, administrative staff, janitorial workers, and food service staff. SEIU also represents workers in the property service industries. Approximately 250,000 SEIU property service workers nationwide clean, maintain, and provide security for commercial office buildings, co-ops, and apartment buildings, as well as public facilities like theaters, stadiums, and airports. SEIU is also one of the largest unions of public school employees, bus drivers, and child care providers, including approximately 80,000 early learning and child care professionals.

2. In my role as president of the Texas SEIU, I lead and oversee all aspects of SEIUS's work in in Texas. I have been president of SEIU in Texas since 2014, Prior to assuming the top leadership position of the Texas SEIU, I had led and won campaigns of healthcare, public, and property service workers, first in California and later in Texas.

3.     SEIU has long been concerned about the effects of air pollution from coal-burning electricity generation on our members and workers globally, and in Texas in particular.

**SIEU Supports the Environmental Protection Agency's Regional Haze Clean-Up Plan for Texas and Oklahoma, and a Stay Will Be Harmful to the Interests of SEIU, its Members, their Families, and their Patients.**

4.     In January 2016, the U.S. Environmental Protection Agency (EPA) proposed a regional haze clean-up plan under the Clean Air Act, which will provide enormous reductions in harmful sulfur dioxide pollution from coal-burning electric utilities across Texas.  It is my understanding that this single rule will reduce Texas's sulfur dioxide emissions by more than 230,000 tons annually, which is more than all of the sulfur dioxide emitted by Louisiana, Arkansas, and Oklahoma *combined*.

5.     Sulfur dioxide pollution causes numerous harmful human health and environmental effects, such as asthma and other respiratory and cardiovascular diseases.  Sulfur dioxide also reacts in the atmosphere to form fine particulate matter that can worsen respiratory diseases, aggravate heart disease, and lead to premature death.  Children and adults with asthma are particularly at risk for adverse health effects.  I also understand that coal-burning power plants are, by far, the largest source of sulfur dioxide emissions in Texas.

6.     Thus, EPA's regional haze plan will provide important health benefits for the Texas communities where our members live and work by reducing

pollutants that cause and contribute to life-threatening respiratory diseases, which disproportionately affect people of color, including our members and their patients. In fact, according to the health benefits report prepared in support of EPA's rule, EPA's haze clean-up plan for Texas will save more than 300 premature deaths; more than 30,000 asthma or respiratory attacks; hundreds of emergency room visits, and more than 50,000 lost work days *every year*. SEIU therefore believes that EPA's regional haze clean-up plan will directly result in enormous health benefits to the Texas communities where our members live and work. Many of SEIU's own members or their family members suffer from asthma or other respiratory diseases.

7. The plan will also have significant benefits for minority and urban communities. We know, for example, that African Americans in Texas are more than twice as likely to die from asthma than their white counterparts.[1] African-American children in Texas are nearly four times more likely to be admitted to the hospital for asthma.[2] The Dallas-Fort Worth area, which is directly affected by pollution from several of the coal-burning power plants subject to the regional haze rule, has more than twice the overall prevalence of asthma than other areas of the State.[3]

---

[1] Texas Dep't of State Health Servs., 2014 Texas Asthma Burden Report at 20 (Dec. 2014), https://www.dshs.state.tx.us/asthma/pdf/2014BurdenRpt.doc.
[2] *Id*. at 28.
[3] *Compare id*. at Fig. 1-3 *with* Fig. 1-6.

8.    The reductions in sulfur dioxide pollution from coal-burning power plants required under EPA's plan will not only directly benefit SEIU members, their families, and the communities where they live and work, but will have beneficial effects on many of the patients SEIU's members care for.  For example, in Los Angeles County, SEIU nurses who regularly treat young patients for asthma and bronchitis believe that the asthma rates in California are no longer rising, in large part, because state and local governments in California have limited harmful emissions from coal-fired power plants.  EPA's haze plan will result in similar reductions in Texas.

9.    EPA's haze clean-up plan will have significant financial benefits for our healthcare system.  According to Dr. George Thurston's public health benefits analysis, the rule will result in more than $3 billion per year in avoided public healthcare costs.

10.    Of course, EPA's regional haze clean-up plan for Texas and Oklahoma will also result in significant air quality benefits for national parks and wilderness areas negatively impacted by pollution from Texas coal-burning power plants.  Members of SEIU in Texas value national parks and wilderness areas like Big Bend and Guadalupe Mountains in Texas, and Wichita Mountains in Oklahoma.  As hard-working Texans, SEIU members expect these treasured parks and public lands to have clean and healthy air when they hike, camp, bike or otherwise explore the vast landscapes set aside for public use and enjoyment. SEIU

members believe that the reductions in emissions from Texas sources are important to help protect and restore natural air to these places.

11.     I understand that the power plants subject to EPA's haze clean-up plan have challenged the rule, and have asked the Court to stay the rule.  To the extent that a stay leads to a delay in the rule's required sulfur dioxide reductions, SEIU members, their families, their patients, and members of the communities where they work will continue to be harmed by the public health and economic impacts of sulfur dioxide pollution from the coal-burning power plants subject to the rule.  Any delay in the implementation of the rule would cause injury not only to the public, but particularly to those of our members that live or work in areas affected by pollution from the coal-burning power plants subject to the rule.  For these reasons, SEIU Texas believes that a stay of EPA's regional haze clean-up plan for Texas and Oklahoma is unjustified and would be harmful to the public interest.

**SEIU Has a Long History of Advocacy for Responsible Environmental and Climate Policies, and the Union Has Taken Significant Steps to Do Its Part to Reduce Harmful Air Pollution.**

12.     In 2006, SEIU became a partner in the BlueGreen Alliance, an organization that unites 14 of the nation's largest unions and environmental groups who aim to be a powerful voice for a cleaner environment and a more equitable economy.  At our 2012 Convention, SEIU adopted a resolution entitled,

"Strengthening Strategic Alliances to Promote Environmental Justice, Sustainability and Good Green Jobs," where the Union resolved to fight for equal protection for all communities from environmental and health hazards, support U.S. and global carbon emissions reductions goals, and expand the scope of existing jobs to include responsibilities that impact energy, climate and air pollution, and sustainability.

13.    More recently, SEIU has focused its interest on addressing climate change and air pollution generally through the Union's 21st Century Blueprint Committee, a group of leaders and staff that have studied trends that will impact workers and their families in the remainder of the 21st century.  This group has concluded that the air pollution that contributes to climate change is already having an inescapable impact on the future of labor.  EIU has begun to study more closely the effects of air pollution on our members and their communities, and to develop solutions at the local, national, and international level.

14.    For example, the Union's research reveals that the already built human environment—that is, the commercial and residential buildings, hospitals, and other industrial buildings where many of our members work—consume significant amounts of energy.  Because much of that energy has been historically generated by fossil-fuel fired power plants, those commercial and residential buildings account for a significant share of pollution that contributes to poor air quality and climate change.

15.    To help remedy the effects of air pollution that contributes to climate change and poor air quality, SEIU and its members have made great strides in addressing and increasing the sustainability and efficiency of the workplace. Building service workers in commercial real estate, hospitals, public buildings, and multi-family residential buildings are improving their skills so that they can do their part to make their buildings more sustainable by consuming less energy and using it more efficiently, thereby directly reducing the amount of air pollution emitted by power plants. The Union's "1000 Green Supers" program, for example, has trained thousands of building service workers to retrofit, recommission, and maintain multi-family housing units to make them more energy efficient. SEIU and its members are doing their part to reduce energy consumption and the emissions generated by electricity generation, and believe that power plants can and should be doing more to reduce their own harmful air pollution which contributes to poor regional air quality and climate generally.

16.    SEIU's strong concern about the effects of climate change and air pollution stems from two missions that underlie all of the Union's work. First, our primary mission is to achieve social and economic justice for all workers and their families. A significant portion of SEIU members are people of color, who are part of communities that are already disproportionately affected by air pollution from fossil-fuel electricity generation. Second, as the largest union of health care workers in the United States, SEIU works every day to address issues of public

health and access to quality healthcare. Our members understand that air pollution from electricity generation is one of the most significant threats to the fulfillment of both these goals. Our members and their families, many of whom live near, or are caregivers in, vulnerable communities, have experienced pollution-related health conditions that have become an increasingly common consequence of air pollution emitted by large coal-burning electric generators. SEIU and its members in Texas are particularly concerned about these impacts given that (as I understand it) Texas generates the largest quantities of air pollution from electric generating facilities in the nation.

17. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of April, 2016.

______________________________

Elsa Caballero

**Declaration of Dr. H. Andrew Gray**

I, Dr. H. Andrew Gray, declare as follows:

1. I make this declaration in response to a motion to stay the final regional haze rule for Texas issued by the U.S. Environmental Protection Agency ("EPA") on January 5, 2016. *See Approval and Promulgation of Implementation Plans; Texas and Oklahoma; Regional Haze State Implementation Plans; Interstate Visibility Transport State Implementation Plan to Address Pollution Affecting Visibility and Regional Haze; Federal Implementation Plan for Regional Haze*, 81 Fed. Reg. 296 (Jan. 5, 2016). This declaration is based on my personal knowledge and opinions which I am qualified to provide based on my education, training, and extensive experience conducting research on air quality.

2. I hold a Ph.D. and M.S. in environmental engineering science from California Institute of Technology and a B.S. in civil engineering/engineering and public policy from Carnegie-Mellon University. For over thirty years, I have conducted research on air quality for governments, corporations, and citizen groups.

3. I previously submitted a report in support of Sierra Club and National Parks Conservation Association's ("NPCA") comments on the proposed regional haze rule for Texas issued by EPA in December 2014. *See* 79 Fed. Reg. 74,818 (proposed Dec. 16, 2014); H. Andrew Gray, *Visibility and Health Modeling*,

*Technical Support Document to Comments of Conservation Organizations*, EPA Docket ID No. EPA-R06-OAR-2014-0754-0070 (Apr. 20, 2015) ("Gray Report").

4. In support of Sierra Club and NPCA's comments on EPA's proposed regional haze rule for Texas and Oklahoma, I submitted a report analyzing the visibility improvement that would result from the pollution controls EPA proposed in the federal implementation plan. On January 5, 2016, EPA issued a final regional haze plan for Texas and Oklahoma, which requires the same power plants to achieve the same emission rates as in the proposal. Therefore, the conclusions in my report on the proposed rule remain valid.

5. Table 1 below shows the visibility benefits that will result from power plant units meeting the emission limits required by the final rule. Haze is measured in deciviews ("dv"), which is a unit of visibility proportional to the logarithm of the atmospheric extinction. The data in Table 1 comes from modeling conducted by EPA, as part of the haze plan Technical Support Document ("TSD").

**Table 1: Deciview Benefits of Evaluated Controls[1]**

| | Emission Unit | Control | Cumulative dv Improvement (all 19 areas) | Benefit at Most Impacted Class I Area (dv) | Class I Area Most Impacted |
|---|---|---|---|---|---|
| Proposed New Controls | Big Brown 1 | WFGD | 1.232 | 0.436 | Wichita |
| | Big Brown 2 | WFGD | 1.236 | 0.438 | Wichita |
| | Coleto Creek 1 | WFGD | 0.555 | 0.200 | Wichita |
| | Monticello 1 | WFGD | 0.863 | 0.264 | Wichita |
| | Monticello 2 | WFGD | 0.793 | 0.242 | Wichita |
| | Tolk 171B | SDA | 0.524 | 0.110 | Salt Creek |
| | Tolk 172B | SDA | 0.571 | 0.120 | Salt Creek |
| Proposed Upgrades | Limestone 1 | WFGD_Upgrade | 0.401 | 0.135 | Wichita |
| | Limestone 2 | WFGD_Upgrade | 0.443 | 0.149 | Wichita |
| | Martin Lake 1 | WFGD_Upgrade | 1.105 | 0.441 | Wichita |
| | Martin Lake 2 | WFGD_Upgrade | 0.954 | 0.381 | Wichita |
| | Martin Lake 3 | WFGD_Upgrade | 0.873 | 0.349 | Wichita |
| | Monticello 3 | WFGD_Upgrade | 0.614 | 0.188 | Wichita |
| | Sandow 4 | WFGD_Upgrade | 0.759 | 0.312 | Wichita |

6. EPA's modeling results indicate that implementation of the final rule will lead to significant and perceptible improvements in visibility. Table 2 shows the total visibility improvement at each of the Class I areas in Texas and Oklahoma expected from the pollution reductions. It also shows the cumulative visibility

[1] See spreadsheet "TX116-007-_33_Vis_modeling_summary.xlsx". Values represent deciview improvement on average W20 days, with baseline emissions of 3 year average annual 2009-2013 (min/max removed) and average natural background conditions. *See also* Proposed Rule, 79 Fed. Reg. at 74,881-82.

DEC 19

improvement across all 19 Class I areas impacted by the pollution from the 8 power plants regulated by the rule.

**Table 2: Estimated deciview improvement (average 20% Worst days)**[2]

| | Wichita Mountains | Big Bend | Guadalupe Mountains | Cumulative dv Improvement (all 19 Class I areas impacted) |
|---|---|---|---|---|
| Scrubber Retrofits | 1.629 | 0.382 | 0.487 | 5.775 |
| Scrubber Upgrades | 1.396 | 0.265 | 0.275 | 5.149 |
| **Total Benefit (delta dv)** | **3.026** | **0.646** | **0.763** | **10.924** |

7. Based on my knowledge and experience, and after reviewing the final and proposed rules and supporting documents, EPA provides ample technical support for emissions limits in the final rule. The sources being regulated significantly impact visibility at Wichita Mountains, Guadalupe Mountains, and Big Bend. The impacts from these Texas sources are greater than the point source impacts from any other state.

8. By developing a relationship between tons of sulfur dioxide reduced and visibility benefits, EPA's methods provided a reasonable estimate of the

[2] The table presents the deciview improvement from the required pollution controls measured against the average natural background. The figures are based on actual emissions (3-year average annual 2009-2013 eliminating min and max year) and are taken from spreadsheet "TX116-007-_33_Vis_modeling_summary.xlsx" at "proposal total vis actual" tab and Table 6 of Gray Report.

visibility benefits associated with the controls it is requiring. The controls it requires will clearly provide significant visibility benefits to the impacted Class I areas. In fact, EPA's approach undervalues the visibility benefits from these controls. EPA calculated, but failed to consider, impacts to Class I areas outside of Texas and Oklahoma, both individually and cumulatively. EPA also underestimated how these benefits compare to visibility improvement provided by previous determinations.

9. As shown in Table 3 below, the rule will significantly accelerate the achievement of the Clean Air Act's natural visibility goal. Guadalupe Mountains will achieve natural visibility approximately 25 years sooner and Big Bend will achieve natural visibility approximately 30 years sooner as a result of the rule.

**Table 3: Estimated Years to Reach Natural Visibility Conditions**[3]

| | Number of Years Under Texas SIP | Number of Years Under EPA Plan | Improvement, in Years, under EPA Plan |
|---|---|---|---|
| **Wichita Mountains** | 97.10 | 81.58 | 15.52 |
| **Big Bend** | 202.80 | 173.04 | 29.76 |
| **Guadalupe Mountains** | 165.80 | 141.79 | 24.01 |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

[3] Adapted from spreadsheet "TX116-007-_33_Vis_modeling_summary.xlsx" at "2018 RPG calcs" tab.

Executed this 1st day of April, 2016.

Dr. H. Andrew Gray

DEC 22

I, Johnathan Hladik, declare as follows:

1. I submit this declaration in support of the Response in Opposition to the Motions for Stay filed by Respondents-Intervenors Sierra Club and the National Parks Conservation Association.
2. I am Johnathan Hladik, Policy Program Director for the Center of Rural Affairs ("the Center").
3. I have Bachelors in Environmental Economics and Natural Resources, a Masters in Environmental Policy, and a Juris Doctorate in Environmental Law.
4. The Center for Rural Affairs is a nonprofit organization founded in 1973 to establish strong rural communities, social and economic justice, environmental stewardship, and genuine opportunity for all while engaging people in decisions that affect the quality of their lives and the future of their communities.
5. The Center does not advocate for the interests of a particular group but advances a set of values that reflect the best of Rural America, including stewardship of the natural environment. Rural communities are intertwined with the local environment and are disproportionately impacted when the environment is harmed. The Center advocates environmental stewardship through several achievable goals, including conservation, a clean energy economy, energy efficiency, and strong regulations on carbon pollution. The Center focuses on clean energy because it provides a significant opportunity to diversify the rural economy, create new opportunity and address the root cause of climate change.
6. My declaration is based on my direct experience as a professional responsible for assisting landowners and other rural stakeholders in equitable and sustainable clean energy projects.
7. The purpose of my declaration is to provide information to the Court relating to the public's interest in the timely implementation of EPA's regional haze rule for Texas and Oklahoma, and the harm to that interest that will occur if the rule is stayed.
8. In recent years, rural Texas communities have enjoyed significant economic, environmental, and public health benefits from the massive influx of wind energy generation in Texas, which has been driven, in part, by wind generation's increasing competitive advantage over coal-fired energy generation.  In Texas's deregulated electricity market, less expensive generation resources are dispatched to the grid before more expensive ones.
9. Due to the significant decreases in the costs of generating wind and solar energy and the increasing costs of coal-fired energy generation, renewable energy generation has gained—and will continue to expand--a competitive advantage in Texas' deregulated electricity market, encouraging additional development of renewables in rural communities.  The increased cost of coal-fired energy generation has been driven, in part, by environmental regulations, such as the regional haze rule for Texas and Oklahoma, which force coal-fired utilities to internalize the previously unaccounted for negative impacts of their pollution.
10. Such regulations benefit rural communities in multiple ways. The regional haze plan may require coal plants to install sulfur dioxide "scrubbers" to reduce their emissions, and many of the plants covered by the rule are located in rural communities.  A study by Ceres found that scrubber installations and retrofits can easily generate many hundreds of construction jobs, tens of permanent on-site jobs to operate the scrubber, and knock-on benefits throughout the community, and we have seen this happen time and again across the country. In La Grange ,

Texas, a town of about five thousand, a $445 million scrubber addition on the Fayette Power Project generated about 300 jobs and a 13% increase in local sales tax revenue. In addition, environmental regulations like the regional haze rule also send important pricing signals to the renewable energy market, encouraging further development of renewable energy in rural communities.

11. Renewable energy, like wind, has a proven record of benefitting rural communities. Renewable energy provides new opportunities, new sources of revenue, and a new source of income for many farmers and ranchers. Any delay in the implementation of the rule delays the development of renewable resources, and therefore harms those rural communities that benefit from renewable energy development.

12. For example, rural communities in Texas have seen economic and environmental community-wide benefits due to wind energy. Texas ranks first in the country for both install and under construction wind supporting over 17,000 wind-related jobs.  The wind energy industry in Texas has provided over $26 billion in capital investment and has thrived, in part, because of smart state policies, such as the Competitive Renewable Energy Zones ("CREZ") which have helped provide the infrastructure necessary to bring wind power from rural areas of Texas where the resource is strongest, to the urban and industrial areas where electricity consumption is highest.

13. Wind's economic benefits to Texas communities have not gone unnoticed: since 2007, the amount of installed wind capacity in Texas has doubled from approximately 4,700 megawatts to over 11,000 megawatts, which accounts for approximately 11% of the state's consumption. Much of that capacity has been installed in rural Texas communities, supporting new jobs created to manufacture, construct, and operate turbines and wind farms, and bringing jobs, tax revenue, and an economic boost to rural areas.  Indeed, recent studies conducted by the American Wind Energy Association estimated the economic benefits of Texas's wind energy industry to exceed $3.3 billion annually, and wind farms pay hundreds of millions of dollars per year to rural landowners, including over ten million dollars per year in Texas.

14. As the wind energy industry has grown, more small towns and rural areas have been able to experience the new possibilities that wind development can deliver. Bringing new opportunities like renewable energy development to these places has proven to be an essential aspect to creating vibrant and healthy communities.

15. Renewable energy development in rural communities also provides numerous indirect benefits to the communities. For example, he property tax revenue generated from wind energy projects provides services for the rural communities, including new funds for essential services like schools, police, and emergency services.

16. The benefits of wind energy have been felt in numerous communities across Texas. In Nolan County, Texas, a county with just over 15,000 people, wind energy provides over 1,100 jobs, nearly 10 percent of the county's workforce. Additionally, those jobs have an average annual salary that can exceed $40,000 at the entry level, which is well above Nolan's 2014 median household income of $37,342. The wind boom has also resulted in a $14.5 million increase in the local tax revenues and over $12 million in local landowner royalties.

17. As rural communities and small towns continue to confront the challenges of a changing demographic and evolving economy, it is important for rural advocates like the Center for Rural

Affairs to look towards the future. Wind energy has proven to be one of several new and growing industries that can bring opportunities to small towns and rural areas and it has demonstrated its potential to help build strong and thriving, lasting communities.

18. Solar energy development brings a lot of these same benefits to rural communities. Installing new solar systems provides new jobs in these areas, and solar is one of the most affordable small-scale renewable energy options for households and landowners. As the price of solar continues to drop, more rural communities are considering the benefits of community solar projects as well, using local expertise and investment to install projects that will generate clean and renewable energy locally.
19. Because of the increasing competitive advantage of wind and solar energy generation in Texas, those sources have been and will continue to displace more expensive, more environmentally destructive coal-fired energy generation. This is a product of existing market forces in Texas's deregulated electricity market, and brings significant benefits to rural communities across Texas, where wind energy development is strongest.
20. In my opinion, the utility and state petitioners seeking to stay the effective date of the regional haze plan for Texas and Oklahoma effectively seek to prolong the inevitable shift away from coal-fired energy in Texas.. Based on my experience, there is every reason to believe that ample low-cost renewable energy will continue to be developed to replace any coal plants that have become un-economical, greatly benefiting rural communities in the process. Any court-ordered delay in implementing the Regional Haze rule will simply delay the already ongoing transition from coal to clean energy, thereby artificially delaying economic renewable energy development that is already occurring in rural Texas, and will continue to occur. Because ongoing and continued wind and solar development in rural Texas provides is vital economic and environmental benefits to those areas, any delay or uncertainty in the continued investment and development of those resources will needlessly harm rural communities' interests.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 6th day of April, 2016, in Lyons, Nebraska.

Johnathan Hladik

Johnathan Hladik, J.D. | Policy Director

Center for Rural Affairs

**DECLARATION OF NATHAN MILLER**

I, Nathan Miller, declare:

1. I have been employed by the National Parks Conservation Association ("NPCA") since 2009, and have been the Engineering and Science Manager of NPCA's Clean Air Program since 2013. In that role, I am responsible for conducting and leading technical analyses relating to air quality in the national parks, with a focus on the Clean Air Act's visibility protection provisions and its implementing regulation, the Regional Haze Rule. I have a Bachelor of Science degree in applied science in chemical engineering, environmental studies, and math from Washington University in St. Louis. Prior to my role with NPCA, I provided research and analysis on air quality and air pollution as an independent environmental consultant and served as Engineering and Science Fellow at Washington University School of Law's Interdisciplinary Environmental Clinic.

2. As Engineering and Science Manager of NPCA's Clean Air Program, one of my responsibilities has been to track, review, evaluate, and submit technical comments on state and federal implementation plans issued under the Clean Air Act's Regional Haze Rule across the country. I previously assisted in the development of NPCA's and Sierra Club's comments on the proposed regional haze rule for Texas and Oklahoma issued by the U.S. Environmental Protection Agency ("EPA") in December 2014. I am providing this declaration in support of

Sierra Club's and NPCA's opposition to motions filed by the some of the affected utilities and the State of Texas to stay EPA's January 5, 2016 final rule. *See Approval and Promulgation Approval and Promulgation of Implementation Plans; Texas and Oklahoma; Regional Haze State Implementation Plans; Interstate Visibility Transport State Implementation Plan to Address Pollution Affecting Visibility and Regional Haze; Federal Implementation Plan for Regional Haze*, 81 Fed. Reg. 296 (Jan. 5, 2016). This declaration is based on my personal knowledge and opinions which I am qualified to provide based on my education, training, and extensive experience evaluating and participating in regional haze planning processes across the country.

3. In support of Sierra Club and NPCA's comments on EPA's proposed regional haze rule for Texas and Oklahoma, I reviewed numerous state and federal implementation plans issued under the Clean Air Act's Regional Haze Rule, and evaluated and compared the pollution controls required under those plans against the controls required EPA's regional haze plan for Texas and Oklahoma. [1] As part

[1] Under the Clean Air Act and its implementing regulation, the Regional Haze Rule, states (or EPA, where the state fails to act) must include in their visibility protection plans emission limits, schedules of compliance, and other measures as may be necessary to make reasonable progress toward natural visibility. 42 U.S.C. § 7491(b)(2). In evaluating and establishing these so-called reasonable progress controls, states must consider (1) the costs of compliance, (2) the time necessary for compliance, (3) the energy and nonair quality environmental impacts of compliance, and (4) the remaining useful life of the source subject to such requirements. *Id*. § 7491(g)(1).

DEC 27

of my review, I also evaluated EPA's cost-effectiveness analysis for the agency's proposed "reasonable progress" controls for reducing sulfur dioxide ("$SO_2$") emission from 14 individual electric generating units ("EGUs") at seven power plants in Texas.[2] On January 5, 2016, EPA issued a final regional haze plan for Texas and Oklahoma, which is substantively identical to the proposed rule.

4. The "cost of compliance" is an explicit factor under the Clean Air Act and the Regional Haze Rule in determining which pollution controls, emission limits, and compliance schedules are "reasonable" for the purposes of ensuring progress toward natural visibility conditions. To determine the cost of compliance under the Regional Haze Rule, EPA and the states typically take the following basic steps: (1) identify the source or sources to be controlled; (2) identify pollution control strategies for the pollutant at issue; (3) identify potential design parameters (*e.g.*, emission limits, capital costs, operation and maintenance costs) for the various control strategies; and then (4) develop cost effectiveness estimates (stated in dollars per ton of pollutant removed) for the various control options under consideration.

---

[2] EPA's plan also includes an emission limit for the San Miguel power plant that reflects continued operation of its recently upgraded scrubber. 81 Fed. Reg. 296, 305 (Jan. 5, 2016). Because the rule does not require any further control for this facility, I did not include it in my review.

5. In the proposed rule and the accompanying Technical Support Documents, EPA determined that the cost of the proposed controls ranges from $368 – $3,178 per ton of $SO_2$ removed. These include flue gas desulfurization retrofits (*i.e.*, new build scrubbers) as well as scrubber upgrades (*i.e.*, improving existing scrubbers). *See* 79 Fed. Reg. 74818, 74876-77 (Dec. 16, 2014); 81 Fed. Reg. 296, 317-318 (Jan. 5, 2016).

6. While the table below is not a comprehensive analysis of every implementation plan issued under the Regional Haze Rule, it makes clear that the costs associated with EPA's regional haze plan for Texas and Oklahoma are well within the range of costs for controls required by states or EPA under the reasonable progress provisions of the Regional Haze Rule.

| **Facility** | **State** | **Control** | **Cost ($/ton)**[3] |
|---|---|---|---|
| Tri-State Generation, Craig Unit 3[4] | CO | Selective Non-Catalytic Reduction | $4,887 |
| Colorado Springs Utilities, Nixon Unit 1[5] | CO | Dry Flue Gas Desulfurization | $3,744 |
| PacifiCorp, Jim Bridger Unit 2[6] | WY | Selective Catalytic Reduction | $3,403 |

[3] Costs in this table are as-reported in the cited Federal Register notices and have not been escalated to the same 2012 dollar basis as EPA's cost effectiveness values for Texas. *See* EPA's Nov. 2014 Cost TSD at p. 3. Cost values for pollution control equipment are typically converted between different years based on the Chemical Engineering Plant Cost Index ("CEPCI"). Because 2012 is the second highest recent year in the CEPCI index, escalating the costs in the table above to 2012 dollars would, in almost all cases, increase or retain the values in the table.
[4] 77 Fed. Reg. 18052, 18087 (Mar. 26, 2012); 77 Fed. Reg. 76871 (Dec. 31, 2012)
[5] 77 Fed. Reg. 18052, 18082 (Mar. 26, 2012); 77 Fed. Reg. 76871 (Dec. 31, 2012)
[6] 79 Fed. Reg. 5032, 5040-5041 (Jan. 30, 2014)

| PacifiCorp, Jim Bridger Unit 3[7] | WY | Selective Catalytic Reduction | $3,320 |
|---|---|---|---|
| PacifiCorp, Jim Bridger Unit 4[8] | WY | Selective Catalytic Reduction | $2,743 |
| PacifiCorp, Jim Bridger Unit 1[9] | WY | Selective Catalytic Reduction | $2,635 |
| Holcim Florence Cement Plant[10] | CO | Selective Non-Catalytic Reduction | $2,293 |
| Rillito Cement Kiln 4[11] | AZ | Selective Non-Catalytic Reduction | $1,850 |
| Colorado Springs Utilities, Nixon Unit 1[12] | CO | Low Nitrogen Oxides Burners & Over-Fire Air | $1,372 |
| Phoenix Cement, Clarkdale Kiln 4[13] | AZ | Selective Non-Catalytic Reduction | $1,142 |
| Basin Electric Power Cooperative, Antelope Valley Station, Unit 2[14] | ND | Low Nitrogen Oxides Burners | $661 |
| Platte River Power Authority, Rawhide Station[15] | CO | Enhanced Combustion Controls | $644 |
| Basin Electric Power Cooperative, Antelope Valley Station, Unit 1[16] | ND | Low NOx Burners | $586 |

7.     As the above table demonstrates, the cost effectiveness of controls

that have been required under the reasonable progress requirements of the Regional

---

[7] 79 Fed. Reg. 5032, 5040-5041 (Jan. 30, 2014)

[8] 79 Fed. Reg. 5032, 5040-5041 (Jan. 30, 2014)

[9] 79 Fed. Reg. 5032, 5040-5041 (Jan. 30, 2014)

[10] 77 Fed. Reg. 18052, 18084 (Mar. 26, 2012); 77 Fed. Reg. 76871 (Dec. 31, 2012)

[11] 79 Fed. Reg. 52420, 52463 (Sep. 3, 2014)

[12] 77 Fed. Reg. 18052, 18082-18083 (Mar. 26, 2012); 77 Fed. Reg. 76871 (Dec. 31, 2012)

[13] 79 Fed. Reg. 9318, 9353 (Feb. 18, 2014); 79 Fed. Reg. 52420 (Sep. 3, 2014)

[14] 76 Fed. Reg. 58570, 58631 (Sep. 21, 2011); 77 Fed. Reg. 20894, 20931 (April 6, 2012)

[15] 77 Fed. Reg. 18052, 18080 (Mar. 26, 2012); 77 Fed. Reg. 76871 (Dec. 31, 2012)

[16] 76 Fed. Reg. 58570, 58631 (Sep. 21, 2011); 77 Fed. Reg. 20894, 20931 (April 6, 2012)

DEC 30

Haze Rule includes costs from $586 to $4,887 per ton of pollutant removed. The values in the table are visually illustrated in the figure below, which demonstrates that the controls required under EPA's regional haze plan for Texas and Oklahoma are reasonable and well within the historical range of costs for controls required by other states to protect and enhance visibility in Class I areas.

8. Similar controls have also been required under the "best available retrofit technology" or BART provisions of the Regional Haze Rule. Although the BART provisions apply only to sources placed in operation during a specific time period and require the consideration of visibility improvements in addition to the four factors considered under reasonable progress provision, cost effectiveness is generally determined in the same way as for reasonable progress. Controls required under the BART provisions have also included cost effectiveness values at and above those required by EPA in Texas. *See, e.g.*, 79 Fed. Reg. 5032, 5039 (Jan.

30, 2014); 77 Fed. Reg. 18052 (Mar. 26, 2012); 77 Fed. Reg. 76871 (Dec. 31, 2012).

I, Nathan Miller, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 7 day of April, 2016.

Nathan Miller

**DECLARATION OF KARL R. RÁBAGO**

I, Karl R. Rábago, declare as follows:

1. I am of legal age and competent to give this declaration. All statements are based on my personal knowledge, unless noted.

2. I served as a Commissioner of the Public Utility Commission of Texas ("PUCT") from 1992-1994 and am currently the Executive Director of the Pace Energy and Climate Center at the Pace Law School, in White Plains, New York.

3. I have more than 25 years of experience working in Texas and on Texas energy and environmental issues in various capacities. In these capacities, I have had the opportunity to work extensively on electric utility regulatory, legislative, and policy issues; renewable energy development issues; voluntary markets for renewable energy; and other aspects of energy markets and regulation. Some of the positions I have held include Deputy Assistant Secretary for Utility Technologies in the Office of Energy Efficiency and Renewable Energy at the U.S. Department of Energy from 1995-1996, Vice President for Distributed Energy Services for Austin Energy, the municipal electric utility for Austin, Texas, from 2009-2012; and director of Government and Regulatory Affairs for the AES Corporation, from 2006-2008.

4. I am providing this declaration in response to claims made by the

parties requesting a stay of the Texas-Oklahoma Regional Haze Rule ("Rule") issued by EPA on January 5, 2016,[1] that absent an immediate stay of the rule, the Public Utility Commission of Texas, electricity customers, and other Texas citizens will suffer "irreparable harm," and that a stay would be in the public interest. I am also responding to those parties' more speculative assertions that the rule will risk the reliability and affordability of the state's electricity supply.

5. Based on my long experience working on Texas energy and regulatory matters within the ERCOT market, I disagree that there will be any harm to the state, state agencies, electricity customers, or the public as a result of the Rule remaining in effect during the pendency of the litigation. Nor, in my opinion, will the Rule cause any harm to these parties or to the Texas electricity grid over the longer term. To the contrary, prompt implementation of the Rule is in the public interest.

6. This declaration is based on my professional experience and knowledge, sources cited herein, and my review of certain materials specific to this case, including: (a) key portions of the Rule (b) numerous reports prepared by ERCOT including "ERCOT, Transmission Impact of the Regional Haze Environmental Regulation (Oct. 15, 2015)" and "ERCOT, Impacts of

[1] *Approval and Promulgation Approval and Promulgation of Implementation Plans; Texas and Oklahoma; Regional Haze State Implementation Plans; Interstate Visibility Transport State Implementation Plan to Address Pollution Affecting Visibility and Regional Haze; Federal Implementation Plan for Regional Haze*, 81 Fed. Reg. 296 (Jan. 5, 2016).

Environmental Regulations in the ERCOT Region (Dec. 16, 2014); (c) a report prepared by Synapse Energy Economics captioned, "Assessing the December 2014 ERCOT Report on Environmental Regulations"; (d) the motions to stay; and (e) the Lloyd declaration.

7. As a result of my experience, including my experience as a Commissioner for the Public Utility Commission of Texas, I am generally familiar with the processes by which the Public Utility Commission, the Texas Commission on Environmental Quality, and other state agencies implement federal legal and regulatory obligations, such as those under the Clean Air Act.

8. While I certainly agree that the public has a strong interest in reliable electricity, the assertions that the Rule will cause near-term or long-term reliability issues are unfounded. No plant operator has stated that it intends to retire a plant affected by this Rule at any point in the future, let alone in the next 10 months or so while this litigation is pending. Yet, the sole basis for the claimed reliability impact is a study that assumes numerous retirements in 3-5 years without replacement resources in the same geographic area.[2] The stay movants do not assert that there will be any reliability risk before that time, nor do they provide any basis for the assumption that these many units will ultimately retire as a result of the Rule, or that competitors will not build and offer effective replacement capacity, such as

[2] Lloyd Decl. ¶30; Tex. Mot. for Stay at 18.

capacity sited in a similar location, where transmission, demand, and brownfield development sites already exist.

9. A second related claim is that the Rule will cause a "likely increase in cost to Texans" due to the costs of immediately "planning and constructing new transmission lines," which are typically passed on to electricity consumers by transmission and distribution utilities. Lloyd Decl. ¶¶ 8, 32. This claim is also incorrect, as explained below. ERCOT and PUCT are already in the process of planning for potential coal retirements and it would be only prudent to continue that planning whether or not a stay is granted. Nor is there a demonstrated need for immediate additional transmission investments.

**A. The Texas Electric Grid is Well-Prepared to Handle Shifts in Generation Resources as a Result of the Rule, if Any Occur.**

10. The stay motions do not assert that any specific generation resources affected by the rule will retire, and refer only to the "potential" or "risk" of retirement.[3] Even if the Rule resulted in a shift away from coal-fired resources, ERCOT is well equipped to handle this shift. The electricity market in Texas is vibrant, adaptive, and more than capable of implementing new control standards,

[3] Mr. Lloyd refers to the December 2014 ERCOT report "Impacts of Environmental Regulations in the ERCOT Region," as finding that approximately 3,000 MW of coal-fired capacity or more faced a risk of retirement "due to the imposition of the Final Rule." Lloyd Decl. ¶27. This statement is clearly incorrect as the referenced report considered a number of different environmental regulations and did not parse out specific impacts of the Rule at issue here. *See* Mem. from J. Fisher, Synapse Energy Economics, to EPA Region 6 and EPA Headquarters, *Re: Assessing the December 2014 ERCOT Report on Environmental Regulations* (Sept. 8, 2015), at 7.

regulatory requirements, and market structures. ERCOT has recently made a multi-hundred million dollar conversion from a zonal to a nodal model,[4] built $7 billion in new transmission capacity under the Competitive Renewable Energy Zone project,[5] integrated many gigawatts of new intermittent renewable energy generation, integrated many gigawatts of new gas capacity, and participant entities have undergone substantial ownership and management change.

11.    Under ERCOT's competitive market structure, lowest-price generation and resources are dispatched on the grid first. Currently, those are energy efficiency, demand response, wind, natural gas, and increasingly solar. Recent ERCOT Capacity, Demand, and Reserve  Reports reflect an addition of over 6,095 MW of gas fired generation and 8,886 MW  of renewable energy since mid-2014.[6] In the same time period, over 3,120 MW of new  gas generation  and over  4,142  MW  of  new renewable  generation  has  moved  to "Operational

---

[4] ERCOT, *ERCOT Launches Improved Wholesale Market Design*, Dec. 1, 2010, http://www.ercot.com/news/press_releases/show/349.
[5] Jim Malewitz, *$7 Billion CREZ Project Nears Finish, Aiding Wind Power*, Oct. 14, 2013, https://www.texastribune.org/2013/10/14/7-billion-crez-project-nears-finish-aiding-wind-po/.
[6] ERCOT, *Report on Capacity, Demand and Reserves in the ERCOT Region* (Dec. 1, 2014) at 6-7, http://ercot.com/content/gridinfo/resource/2015/adequacy/cdr/CapacityDemandandReserveRep ort-Dec2014.pdf; ERCOT, *Report on Capacity, Demand and Reserves in the ERCOT Region*,(May 4, 2015) at 5, http://ercot.com/content/gridinfo/resource/2015/adequacy/cdr/CapacityDemandandReserveRep ort-May2015.pdf; ERCOT, *Report on Capacity, Demand and Reserves in the ERCOT* Region,(Dec. 1, 2015) at 5-6, http://www.ercot.com/content/gridinfo/resource/2015/adequacy/cdr/CapacityDemandandReserveReport-December2015.pdf.

Status."[7] During the same period, no new coal-fired generation was added.

12. ERCOT expects further large additions of gas, wind, and solar prior to the compliance deadline for the haze rule. Wind resources provided 14 percent of the generation capacity in the ERCOT market in Texas in 2014, and ERCOT expects Texas to double its wind energy capacity by 2017. The most recent ERCOT report on the long-term outlook for generation capacity, from December 2015, "shows a continuing rise in planning reserve margins in coming years, due primarily to the anticipated addition of more than 5,000 megawatts (MW) of new generation capacity by the summer of 2017 and another 4,300 MW in the following year."[8]

13. ERCOT is predicting a substantial increase in solar resources in the next two years as well, as shown in the chart below.[9] Beyond the projects with Interconnection Agreements signed depicted below, many more projects totaling thousands of megawatts are in the planning stages.[10]

---

[7] *Id*.
[8] ERCOT, *News Release*, http://www.ercot.com/news/press_releases/show/81272.
[9] ERCOT, *Monthly GIS Report*, March 2016, http://www.ercot.com/gridinfo/resource.
[10] *Id.*



ERCOT Solar Installations by Year (as of March 2016)
Cumulative MW Installed
IA Signed-Financial Security Posted
IA Signed-No Financial Security
3000 MW
2500 MW
2000 MW
1500 MW
1000 MW
500 MW
0 MW
15
42
42
82
82
121
121
193
193
288
288
288
983
551
1,822
288
1,193
572
2,053
2010
2011
2012
2013
2014
2015
2016
2017
The data presented here is based upon the latest registration data provided to ERCOT by the resource owners and can change without notice. Any capacity changes will be reflected in current and subsequent years' totals. Scheduling delays will also be reflected in the planned projects as that information is received. This chart reflects planned units in the calendar year of submission rather than installations by peak of year shown.

14. Planned and anticipated solar generation additions are particularly significant in ERCOT because, like coastal wind, solar has a high coincidence factor with system peak demand. As we learned when I served at Austin Energy, large scale solar generation (so-called "utility scale" solar) that is sited in far West Texas benefits from low grid congestion, a time difference that improves generation coincidence with afternoon peaks in load centers, affordable siting, and extremely low water requirements. Natural geographic features in West Texas also reduce cloud impacts and improve capacity factors for this generation. Utility scale solar can be built faster than any other utility-scale resource.

15. As a result of these many additions and abundant resource

potential, ERCOT will have ample capacity to accommodate retirements, if any, resulting from the Rule on a timely basis. ERCOT Capacity Demand and Reserve Reports show that Total Capacity will exceed projected Firm Peak Load (a measure of peak energy demand) by over 10,000 MW in every year through 2025, providing a comfortable reserve margin, even in the face of potential retirements. ERCOT's policy is to keep a reserve margin of at least 13.75%. In 2021, the year by which all plants must comply with the Rule, ERCOT is predicting capacity levels approximately 15,000MW higher than peak load, with a reserve margin of 21%.[11]

16. The new cleaner resources coming on line tend to provide electricity at a much lower cost than the older coal-fired power plants affected by the Rule. For example, the City of Austin recently entered into a Purchase Power Agreement ("PPA") for solar at under 5 cents per KWh.[12] These costs are substantially below the average rate for power from baseload coal units, which

[11] *See* sources cited in note 6. ERCOT's recent predictions of available generation capacity have even led to the recent claim that it is a "market of extreme overcapacity." *See* Jordan Blum, *Power company sues grid operator over demand, supply projections*, Houston Chronicle, Mar. 26, 2016, http://www.houstonchronicle.com/business/energy/article/Power-company-sues-grid-operator-over-demand-7122935.php. A recent Moody's report states that the grid should have electricity reserves that exceed ERCOT's goals for years to come and that Congress' December extension of federal tax credits for wind and solar projects will cause more growth and "hold down already low prices" in an "abundantly supplied ERCOT market." *Id.*

[12] Steven Lacey, *Cheapest Solar Ever: Austin Energy Gets 1.2 Gigawatts of Solar Bids for Less Than 4 Cents*, Greentech Media.com, Jun. 30, 2015, http://www.greentechmedia.com/articles/read/cheapest-solar-ever-austin-energy-gets-1.2-gigawatts-of-solar-bids-for-less.

.

have an average levelized cost of energy in the United States of 6.5-15 cents per KWh.[13] Through rigorous planning and analysis, we had visibility on these resources several years earlier, when I was an executive at Austin Energy.

17. It is not surprising then that Texas' increased reliance on natural gas and renewables for power generation over the past decade has been accompanied by a dramatic *decrease* in average electricity prices, with average annual real-time market prices within ERCOT declining from approximately $70 per MWh in 2005 to approximately $40 per MWh in 2014. [14]

18. Historical evidence confirms that the Texas grid is able to successfully accommodate shifts in generation type without compromising affordability or reliability. The following table demonstrates the changing nature of additions to the Texas electricity grid, and particularly the shift towards natural gas and wind beginning in 2000.[15]

[13] Lazard. "Lazard's Levelized Cost of Energy Analysis – Version 9.0." (Nov. 2015). *See* https://www.lazard.com/media/2390/lazards-levelized-cost-of-energy-analysis-90.pdf
[14] Report of the Texas House of Representatives Committee on Electric Generation Capacity and Environmental Effects, Select - 80th R.S. (2007) at 19-21, http://www.lrl.state.tx.us/scanned/interim/80/EL26e.pdf
[15] *Id*. at 20.



Electric Generation Capacity Additions in Texas (1950-2006)
Generation Capacity in Megawatts
7000
6000
5000
4000
3000
2000
1000
0
Natural Gas
Lignite Coal and PRB
Nuclear (Uranium, Plutonium, Thorium)
Wind

## B. A Stay Would Not Obviate the Need for Reasonable Transmission Planning, Which ERCOT is Already Undergoing.

19. In addition to ensuring the adequate overall capacity of generation resources, ERCOT must plan for adequate local transmission resources such that the grid remains operationally balanced and that transmission lines can handle demand according to dynamic power flow conditions.

20. Mr. Lloyd asserts that the PUCT will be harmed by being forced into a choice between planning to build new generation and upgrading the transmission system to accommodate probable retirements, or accepting the prospect of degraded reliability. Lloyd Decl. ¶ 35. Aside from the speculative nature of Mr. Lloyd's assertions, it is my opinion that the exact opposite is true: these planning decisions should already be underway, and it is delay that would harm the PUCT. As described below, such planning is indeed ongoing already.

21. The electricity market is constantly in transition, in Texas and across the United States. Retirement decisions loom for many older cold-fired

power plants like those potentially impacted by the Rule. A stay of the Rule is not the sole or even likely dispositive condition relating to the ultimate economics of the plant. Many other factors, such as the market price of fuels, the level of electricity demand, the cost-effectiveness of alternative resources, drought conditions, and environmental regulations will also impact retrofit, retirement, and replacement decisions. A stay might delay a retirement, replacement, or retrofit decision, but this decision must ultimately be made.

22.    The Rule does not alter ERCOT's ability, or its obligation, to plan for resource and transmission needs in the event of coal retirements. For example, as part of its planning process, ERCOT conducts annual Long-Term System Assessments, which specifically consider the possibility of significant retirements and related transmission needs. As a result of such planning, over 700 miles of new transmission lines will be built in 2016, and over 950 miles will be rebuilt, upgraded, or reconductored in 2016.[16]

23.    ERCOT also conducts transmission studies in response to individual retirement notifications. For example, in response to notifications from Luminant indicating that certain units covered by the Rule (Martin Lake units 1, 2, and 3 and Monticello units 1 & 2) would be operating only seasonally, ERCOT reviewed whether these plants should be eligible for "reliability must-run status"

---

[16] ERCOT, *Transmission Project and Information Tracking* ("ImprovementCostSummary" Tab), http://www.ercot.com/gridinfo/planning.

and found that there would be no reliability problems resulting from seasonal mothballing of these plants.

24. As a result of ongoing and regular planning procedures, ERCOT and the PUCT are already engaged in the process of planning for potential coal plant retirements, including those affected by this Rule. For example, ERCOT included a "Stringent Environmental" scenario in its 2014 Long Term System Assessment to plan for transmission needs, and also anticipated that Big Brown units 1 and 2 (which would need new scrubbers to comply with the Rule) would retire in *any* scenario.[17] This study was performed prior to the proposal of the Rule.

25. The history and current trends of the Texas energy market make clear that ERCOT and the PUCT are eminently capable of planning for potential retirements in a timely fashion, and that undertaking such planning does not create a burden or harm justifying or necessitating the requested stay. Indeed, they have already begun doing so for the units most at risk of retirement as a result of the Rule.

26. A stay would not obviate ERCOT and PUCT's obligation to plan for potential retirements, especially given that there are many other drivers for coal plant retirements independent of the Rule. *See* Schlissel Declaration. A stay of the Rule would instead lead to an unnecessary and inefficient interruption in ongoing

[17] ERCOT, *2014 Long-Term System Assessment for the ERCOT Region* (Dec. 2014) at 10, 72.

planning processes.

27. Timely and thoughtful implementation of the Rule is possible between now and 2021. Judicial review of regulatory decisions is commonplace. As a former regulator, federal executive, private sector developer, and utility executive, my experience is that valuable planning can and does occur during the pendency of such review. This planning can effectively account for likely judicial outcomes and generate real value while husbanding resources. The 10 months or so during which judicial review proceeds can be used quite effectively to improve understanding, develop plans, evaluate options, and coordinate.

28. Contrary to the tenor of the Movants' pleadings, planning and coordination is not a cost of the Rule, but a benefit. In my experience, the benefits of sound planning and coordination outweigh the relatively small associated costs, especially when the issues are potentially as weighty as those presented by implementation of the Rule. As a proactive, conservative, and prudent market overseer, the PUCT should have been planning and engaging around this situation for many years, or at least since the proposal of the Rule in December 2014.

**C. None of the Information Provided by the Movants Demonstrates a Need for Immediate Expenditures on Costly Transmission Lines.**

29. The stay movants have not presented credible evidence that a stay is necessary to avoid significant expenditures on transmission projects while the litigation is pending. I disagree that the transmission distribution utilities must

immediately begin making costly investments if the rule is not stayed. The stay movants rely exclusively on the ERCOT report entitled "Transmission Impact of the Regional Haze Environmental Regulation" (Dec. 1, 2015) for their claim that the Rule will require significant transmission upgrades that must begin immediately. *See* Lloyd Decl. ¶30, Tex. Mot. for Stay at 18. That study, however, did not evaluate whether any affected EGUs would have to retire due to the Rule and/or other factors, stating specifically that it was "not intended to evaluate the viability of specific units." Rather, ERCOT simply created hypothetical scenarios under which groups of affected EGUs are presumed to retire, while no generation is presumed added in the same zones. The report found that "[s]ignificant upgrades to the ERCOT transmission infrastructure *might* be required depending on: The amount of coal-fired capacity retirement [which, per above, has not been studied, and] [t]he locations of the new generation resources [which also was not studied]." (emphasis added). Some stakeholders pointed out that if new capacity were needed, competitors would be likely to install new resources in the same areas as the retirements, given existing transmission lines, demand for electricity, and brownfield development sites. Such approaches significantly reduce the cost and time required to bring replacement capacity on line.

30. Much more planning and evaluation is required in order to accurately assess potential future scenarios and options for maintaining reliability,

and there remains considerable controversy among stakeholders related to ERCOT planning assumptions and study techniques.[18] Thus, given the major omissions discussed above, the ERCOT report stands only for the principle that planning and analysis are required now in order to better predict whether plants actually will retire, what the driving factors of such decisions are, and what additional generation or other resources will be required to maintain reliability. This planning should not wait for judicial finality, especially since the Rule is only one of several factors impacting retirement decisions and system reliability. *See also* Schlissel Decl.

31. Even ignoring the flaws leading to ERCOT's narrowly-based findings, the report's conclusion that "upgrades" to infrastructure "might" be needed does not provide a basis for assuming, as Texas does in its motion, that these upgrades necessarily include the construction of entirely new transmission lines with long permitting and construction lead times. ERCOT can more quickly employ other approaches to resolve local reliability problems. For example, ERCOT uses a variety of "ancillary" services— e.g., agreements with large electricity consumers that can quickly ramp up or down their use of electricity from the grid upon request— to complement generation-based strategies for

[18] *See* Cyrus Reed, Lone Star Chapter of Sierra Club, *ERCOT's Analyses of Haze Pollution and Clean Power Plan Safeguards More Like Academic Exercises Than Likely Outcomes*, Oct. 28, 2015, http://www.sierraclub.org/texas/blog/2015/10/ercot-s-analyses-haze-pollution-and-clean-power-plan-safeguards-more-academic.

balancing grid operations. ERCOT has not addressed the role of such services in the locations where it expects possible retirements of coal-fired generation.

32. As no retirements or major transmission projects have been credibly linked to the Rule's impacts alone, it is also speculative to predict that the "reliability must run" contracts referenced by Mr. Lloyd and the stay movants would be needed. Such contracts are rare and only used as a last resort if there are no other options to maintain reliability.[19] They are not, as suggested by the stay movants, a tool that is commonly used in Texas.

33. Likewise, the stay movants provide no support for the somewhat histrionic speculation that if plants retire, rotating outages would be required to reduce demand. ERCOT has been working diligently to expand the use of "demand response" technologies and incentives, which allow grid operators to reduce demand in certain locations to preserve grid reliability *without* outages. Specifically, ERCOT has made market changes that have led to a large growth in the program, with ERCOT procuring more than 900 megawatts of capacity this year of resources that can be called upon in the case of a grid emergency.[20]

34. In addition, the lack of preparedness for a plant going off-line would be a problem of ERCOT and PUCT's own making if it occurs. Mr. Lloyd

---

[19] ERCOT Protocol Section 3.14.1.5, http://ercot.com/mktrules/nprotocols/2015/02/February_2,_2015_Nodal_Protocols.pdf.

[20] ERCOT, *ERCOT Update to DSWG ["Demand Side Working Group"]*, Feb. 19, 2016, http://www.ercot.com/calendar/2016/2/19/87079-DSWG.

points out that ERCOT requires only a very short 90-day notice window for companies to give notice of capacity retirements. Lloyd Decl. ¶29. In a report to EPA Region 6, included in the Rule's docket, the firm of Synapse Energy Economics found this provision was one of many that demonstrated a short-sighted perspective taken by the PUCT and ERCOT on market operations, and one that is within their own authority to correct.

35. The PUCT has authority—indeed, an obligation—to adopt rules to ensure the reliability of the electric system. ERCOT and PUCT could substantially improve their planning and reaction capacity by lengthening this notification requirement and making full use of the period during which judicial review of the Final Rule is pending to continue planning for potential retirement, and to begin to shape responses to any attendant consequences.

36. Rather than correcting the problems inherent in ERCOT's retirement notification procedures, granting a stay would allocate market risk to the broader electricity market in Texas by allowing poor planning.

37. While Mr. Lloyd suggests a stay is necessary to avoid irreparable harms to the grid, in my opinion, the opposite is true. A stay has the perverse effect of delaying the planning process and transferring the operator's inherent business risks to the grid. A stay would encourage the affected utilities and ERCOT to delay planning for retirements that are already on the horizon. Because transmission

upgrades are already being planned and some retirements are expected with or without the Rule, Mr. Lloyd is incorrect when he says that transmission planning "costs [accruing during judicial review] would be unnecessary should the Final Rule be overturned." Lloyd Decl. ¶35.

38. In my view, reliability efforts benefit from regulatory certainty. A stay injects uncertainty into the energy transition process that is already ongoing. Several plants are already on the economic bubble, and the system operator needs to be (and is in fact already) planning for their retirement. A stay would not avoid reliability concerns, but actually threatens to exacerbate them.

39. Creating a reliability problem by refusing to plan, and seeking Court blessing for such an imprudent course through an application for a stay does not constitute good regulatory oversight or guidance. Indeed, reliability problems associated with plant retirements are not proximately caused by and do not indicate a problem with the Final Rule. Rather, any attendant reliability problems would be squarely based on poor planning and market oversight by the movants.

40. For regulators and market participants, planning in the face of uncertainty is a given, and a prudent course if any party can discern potential reliability concerns under plausible, even if not likely, market scenarios. To seek a judicial excuse from such prudent planning is, in my opinion, irresponsible regulatory behavior. Tolling of compliance deadlines is only a partial relief to the

consequences of failure to plan during the pendency of judicial review, as planning processes would be severely disrupted by on-again, off-again interruptions associated with the Rule, which is only one market driver among many.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on April 6, 2016.

Karl R. Rábago
Executive Director
Pace Energy and Climate Center
Pace University School of Law

**DECLARATION OF DAVID SCHLISSEL**
**INSTITUTE FOR ENERGY ECONOMICS AND FINANCIAL ANALYSIS**

I, David Schlissel, declare:

1. I am Director of Resource Planning Analysis for the Institute for Energy Economics and Financial Analysis ("IEEFA"). I conduct research on a range of fossil fuel and renewable resource issues including coal-fired electric generating unit ("EGU") costs and operating performance and the relative costs of natural gas and renewable alternatives.

2. Prior to joining IEEFA, I worked for four decades as a consultant and attorney on complex management, engineering, and economic issues, primarily in the field of energy. My clients included state regulatory commissions, state attorneys general, several states, state consumer advocates, cities, power plant suppliers, an independent power producer, and consumer and environmental organizations. I have researched coal, energy, and environmental issues in more than 30 states and several foreign nations and have published numerous reports on the factors that have influenced the economic and financial viability of proposed and existing fossil fuel-fired power plants and renewable alternatives. I also have testified as an expert witness in more than 165 proceedings before 35 state public utility commissions, before the Federal Energy Regulatory Commission ("FERC")

and the U.S. Nuclear Regulatory Commission, and in state and federal court litigation.

3. I hold undergraduate and advanced engineering degrees from the Massachusetts Institute of Technology and Stanford University, respectively, and a law degree from Stanford Law School.

4. This declaration is based on my education, experience, and review of materials I gathered, in addition to those submitted by petitioners or provided to me by counsel for Sierra Club.

**A. Summary of Opinions**

5. The State and Utility Petitioners' declarations in support of the stay suggest that EPA's regional haze plan for Texas and Oklahoma will cause dire and irreparable reliability impacts to the ERCOT electricity system because the rule itself will render the affected electric generating units uneconomic, and will therefore force plants to retire. It is my opinion that these units have come under substantial economic and financial stress and are at risk of retirement in the coming years due to a number of circumstances independent of EPA's regional haze plan for Texas and Oklahoma, including:

a. The collapse of natural gas prices and a subsequent decline in the cost of generating power at natural gas-fired power plants;

b. Increased competition from renewable wind and solar resources, as the total MW of installed wind and solar capacity have soared in recent years due to steep declines in the installation prices for wind and solar photovoltaic ("PV") resources;

c. Precipitous declines in energy market prices in the deregulated wholesale markets where many existing coal plants are located; and

d. Rising coal plant operating and maintenance costs, decreased value in coal assets, and unfortunate business decisions made by the utility companies themselves.

6. All of these circumstances are independent of EPA's final regional haze rule for Texas and Oklahoma, and all have combined to undermine the viability of continued operation of the existing coal-fired plants affected by the rule, and the profitability of the companies that own them.

7. In my opinion, additional retirements of coal-fired EGUs can be expected in Texas in coming years, independent of EPA's regional haze rule, as none of the market forces and economic trends listed above and discussed in this declaration can reasonably be expected to abate sufficiently, if at all, to support the continued operation of many coal-fired EGUs in Texas. Staying the compliance dates for EPA's regional haze rule for Texas and Oklahoma will not reverse these trends.

8. Because market forces and economic trends discussed above are likely to lead to the retirement of coal-fired EGU in Texas independent of the regional haze rule, a stay of the rule will not eliminate or reduce the need for the ERCOT, the system operator, to conduct the resource and transmission planning necessary to maintain reliability. Moreover, contrary to the assertions of the utility petitioners, the costs associated with planning for compliance during the period of time that it will take this Court to review the rule (which I assume would be on the order of six to nine months) would be insignificant relative to the total operating revenues of the utilities.

9. Finally, as the amount of electricity generated from coal has declined in ERCOT, the market price of electricity has declined substantially—by more than 40%, in fact. In ERCOT, coal has been displaced by cheaper sources of electricity, such as wind, solar, and natural gas. Thus, contrary to the claims of Mr. Lloyd and the Petitioners, any additional drop in coal-fired generation will likely not lead to any increase in market energy prices.

## B. <u>Natural Gas Prices Declined Precipitously Beginning in Late 2008 and Early 2009.</u>

10. Figure 1 below shows the historical annual prices for natural gas between the years of 2004 and 2015, as well as the forward prices for the years 2016 through 2022. The sharp decline between gas prices in 2008 and 2009 is readily

apparent. For example, gas prices have fallen at the Henry Hub natural gas pricing location by 70 percent between 2008 and 2015.[1]

**Fig. 1: Natural Gas Prices at Henry Hub**[2]



11.    This steep drop in natural gas prices has led to significant declines in the operating costs at gas-fired power plants, which has made them much more competitive against generation from coal-fired units.

---

[1] *Id.*

[2] Data on historical natural gas prices derived from SNL Financial. Forward prices from OTC Global Holdings as of March 25, 2016, downloaded from SNL Financial.

12. Most importantly, natural gas prices are not expected to rebound significantly at any time in the foreseeable future, as evidenced in the natural gas forward prices shown in Figure 1 above, which represent what the market expects for future natural gas prices.

13. As a result, the prices of generating power at natural gas-fired EGUs are not expected to increase significantly in coming years. This development will maintain natural gas's competitive advantage over coal for generating electricity and, therefore, will undermine the viability of the continued operation of existing coal-fired EGUs. This trend is independent of EPA's regional haze plan for Texas and Oklahoma, or any other environmental regulation.

## C. Coal-Fired EGUs Face Increased Competition from Renewable Wind and Solar Resources.

14. At the same time that natural gas prices have declined precipitously, there also has been a tremendous increase in the both the installed wind and solar capacity on the electric grid and the amount of energy generated by this growing renewable capacity. These increases are due in large part to steep declines in solar and wind installation costs, declines that are expected to continue in coming years. This rapid growth in new wind and solar capacity and generation also has been due improved operational efficiencies, and increased interest in carbon-free resources. None of these factors can be expected to abate in the coming years, and these trends are independent of the regional haze rule.

15. The price declines for power from wind and solar resources in Texas have been impressive in recent years. For example, wind purchase power agreement (PPA) prices in ERCOT and the Southwest Power Pool (SPP) declined from an average of $54 per megawatt hour (MWh) in 2009 to $22.42 in 2014, and have remained inexpensive since then. Solar PPA prices in Texas also are low: Austin Energy recently finalized a PPA for solar at under $50 per MWh.[3]

16. Under ERCOT's competitive market structure, lowest priced generation resources, like wind and solar (which have no fuel costs) are dispatched on the grid before fossil fired units, like natural gas and coal, which do have fuel and higher variable non-fuel operating & maintenance (O&M) costs. This means that wind and solar generated power displaces electricity from existing coal-fired EGUs.

17. As a result of the factors identified in the previous paragraphs, installed wind capacity in ERCOT increased from 1,854 megawatts (MW) to 15,764 MW in just the decade from 2005 to 2015.

[3] Cheapest Solar Ever: Austin Energy Gets 1.2 Gigawatts of Solar Bids for Less Than 4 Cents, Greentech Media.com (Jun. 30, 2015), http://www.greentechmedia.com/articles/read/cheapestsolar-ever-austin-energy-gets-1.2-gigawatts-of-solar-bids-for-less.

**Fig. 2 – Cumulative Wind Capacity In ERCOT**[4]

18. As a result of this growth in installed capacity, the generation from wind has skyrocketed in the ten years from 2005 through 2015.

[4] ERCOT, 2015 State of the Grid Report at 21, *available at* http://ercot.com/content/news/presentations/2016/2015_StateoftheGridReport.pdf.

**Fig. 3 – Annual Wind Generation In ERCOT**[5]

19. Due to this increase in generation, the share of wind energy in ERCOT has grown from 1.4 percent of total generation in 2005 to 11.7 percent in 2015. Wind's share of the generation in ERCOT has been even higher in recent months, averaging more than 17 percent of the total energy produced in the months of November 2015 through February 2016.

20. The amount of solar capacity installed in ERCOT and the amount of energy produced by solar also have increased in recent years.

---

[5] ERCOT, Annual Demand & Energy Reports, *available at* http://ercot.com/news/presentations.

**Fig. 4 – Cumulative Solar Photovoltaic Capacity (MW) in ERCOT[6]**

21. Additional wind and solar capacity is expected to be installed in ERCOT in the coming years. For example, another 7,563 MW of wind and 2,124 MW of solar capacity are expected to be added in 2016.[7] ERCOT's long-term study assessment confirms that even without any significant new environmental regulations, such as the regional haze plan for Texas and Oklahoma, the statewide

[6] ERCOT, 2015 State of the Grid Report at 25, *available at* http://ercot.com/content/news/presentations/2016/2015_StateoftheGridReport.pdf.

[7]https://www.snl.com/interactivex/article.aspx?id=35604954&KPLT=6&s_data=si%3d5%26kpa%3d4871c447-2a11-45ad-8f85-23cf90af0108%26sa%3d

trend in renewables will continue. Even assuming a "business as usual" scenario (*i.e.*, without the regional haze plan), ERCOT estimates that nearly 10,000 MW of solar will be added by 2029.[8] The addition of this new wind and solar capacity will increase the economic and financial stress on coal-fired EGUs, irrespective of the regional haze rule for Texas and Oklahoma.

### D. Generation at Coal-Fired EGUs in Texas Has Declined Steeply As a Result of Low Natural Gas Prices and the Addition of More Renewable Wind and Solar Capacity.

22. The substantial drop in natural gas prices beginning in late 2008 and early 2009, reinforced more recently by a surge of new renewable resources, has made it difficult, if not impossible, for coal-fired EGUs in Texas to compete. As a result, the amount of power generated by coal-fired EGUs in Texas, including those plants subject to the regional haze rule, has declined quite significantly. This trend is readily apparent in coal-fired EGU generation data over the past several years on regional, company, group, and individual plant levels.

23. For example, coal's share of the total energy generated in ERCOT has declined from a peak of 39.5 percent in 2010 to a low of 28.1 percent in 2015.

[8] ERCOT, Analysis of the Impacts of the Clean Power Plan at 6, table 3 (Nov. 17, 2014).

**Fig. 5 – Coal's Share of the Total Energy Generated in ERCOT**[9]

24. The industry metric "capacity factor" compares how much power an EGU actually generates in a specific time period, such as a month or a year, with how much power the plant would have produced if it had operated at its full capacity for all of the hours in the time period. The combined annual capacity factor reported by Energy Futures Holding Corporation for the lignite/coal-fired facilities owned by its Texas Competitive Holdings Company LLC in Texas have declined by some

[9] The percentages shown in Figure 5 were derived from information included in ERCOT's Annual Demand & Energy Reports, *available at* http://ercot.com/news/presentations.

35 percent since 2007. These holding companies own the Big Brown, Martin Lake, Monticello, and Sandow 4 EGUs subject to EPA's haze rule.

**Fig. 6 – Annual Capacity Factors of Energy Futures Holdings' Lignite/Coal Plants 2007-2015**[10]

25. Energy Futures Holding Corporation's annual SEC Form 10-K filings indicate that these declines in generation at the lignite/coal facilities owned by its Luminant subsidiary are the direct result of low wholesale market prices. For example, in 2012, Luminant determined that two of the three units at its Monticello

[10] This figure includes the annual capacity factors for the Big Brown, Martin Lake, Monticello, and Sandow 4 EGUs as reported by Energy Futures Holdings in its annual SEC Form 10-K filings.

coal-fired EGU and one of the two units at its Martin Lake EGU could no longer compete in the marketplace as year-round generators and requested that they be seasonally idled starting in October of each year.[11] This action was taken due to low wholesale electricity prices.[12] While under seasonal suspension, as Luminant calls it, the units generally only run during the summer months.[13] As a Luminant spokesperson explained, "[w]ith power prices very low, those two units are not economical to run during these low demand seasons."[14] In other words, the company tries to limit generation to those periods when market prices are higher than plant variable operating costs.

26. The generation from the eight coal-fired power plants in Texas subject to the regional haze rule also declined has declined significantly in recent years, as shown in Figure 7, below. These declines are entirely independent of the pending rule:

[11] Energy Futures Holding Corporation SEC Form 10-K for the Fiscal Year Ending December 31, 2014, at page 42.
[12] *Id.*
[13] *Id.*
[14] *Id.*

**Fig. 7 – Decline in Generation Between 2011 and 2015 at Texas EGUs Subject to Regional Haze Rule[15]**

[15] Data derived from EIA Form 923 for respective facilities, as reported by SNL Financial. Note that NRG Texas Power, L.L.C., which owns and operates the Limestone power plant, has not moved for a stay of the rule, or provided any declaration supporting a stay.

27. The annual declines in the MWh of energy produced at Luminant's coal-fired units at Monticello and Martin Lake provide vivid examples of how low natural gas prices and increased generation from renewable resources have affected the generation at coal-fired EGUs. In particular, as can be seen from Figures 8 and 9, the generation at Monticello and Martin Lake began to drop when natural gas prices declined precipitously in the years 2008 and 2009.

**Fig. 8 – Annual Generation at Monticello Units 1-3 from 2005 to 2015** [16]

[16] Data derived from Luminant EIA Form 923, as reported by SNL Financial.

**Fig. 9 – Annual Generation at Martin Lake Units 1 & 2 from 2005 to 2015** [17]

28. Monticello used to be a base load facility, operating at an average 86 percent annual capacity factor between January 1, 2005, and the end of 2011. However, Monticello's operations have declined so substantially, in large part due to low ERCOT wholesale energy market prices, that the entire plant has averaged only a 39 percent capacity factor between the beginning of 2012 and the end of 2015.[18]

29. Contrary to the suggestions of Mr. Lloyd and petitioners, the shift from coal-fired energy generation, which is already occurring, has not and will not subject

[17] Data derived from Luminant EIA Form 923, as reported by SNL Financial.
[18] *Id.*

customers to increased costs. In fact, Texas' increased reliance on natural gas and renewables for power generation has been accompanied by a dramatic ***decrease*** in average electricity prices, with average annual real-time market prices within ERCOT declining from approximately $70 per MWh in 2005 to approximately $40 per MWh in 2014.[19] Thus, the data shows that the shift away from coal is already occurring – and in fact is accelerating– within Texas's existing free market structure, without negatively impacting rates.

## E. Energy Market Prices Have Declined Substantially

30. The substantial drop in natural gas prices beginning in late 2008 and early 2009, reinforced more recently by a surge of new renewable resources, has led to much lower energy market prices in the deregulated wholesale markets like those administered by ERCOT. This means that at the same time that coal-fired EGU's are under pressure due to declining generation, they are under additional pressure because they are producing less revenue per megawatt hour of power sold into the market. This is true for both peak and off-peak periods,[20] as shown in Figures 9 and 10, below:

---

[19] EDF CPP Report at 9-10.

[20] The peak hours in ERCOT are 7 am to 10 pm, Monday through Friday. The remaining hours of the week are off-peak.

**<u>Fig. 10 – ERCOT Average Monthly Energy Market Prices 2005-March 2016[21]</u>**

31. The declining trend in ERCOT wholesale energy market prices can be seen in Figure 10, except for price spikes in 2011 and the winter of 2014.

32. Most importantly, ERCOT energy market prices are not expected to increase significantly at any time in the near future.

---

[21] Data from SNL Financial.

**Fig. 11 – ERCOT Forward Peak and Off-Peak Market Prices as of April 1, 2016**[22]

33. In fact, except for sharp peaks in summer months, both peak and off-peak wholesale market prices are expected to remain very low through at least 2022.

34. In its SEC Form 10-K filing for the Fiscal Year Ended December 31, 2015, Energy Futures Holding Corporation, clearly articulated the dual impact that low ERCOT wholesale energy prices have had on the revenues and operation of the lignite/coal plants owned by its Luminant subsidiary:

> Wholesale electricity revenues decreased $587 million, or 46%, to $680 million in 2015 reflecting a $362 million decrease in sales volumes and a $225 million decrease due to lower average wholesale

[22] Downloaded from SNL Financial on April 3, 2016.

> electricity prices. A 29% decrease in wholesale electricity sales volumes was driven by lower generation volumes that resulted from increased economic backdown (including seasonal operations) at our lignite/coal generation facilities. The increase economic backdown at our generation facilities and the lower average wholesale electricity sales prices were driven by a 35% decline in average wholesale electricity prices in the year ended December 31, 2015, which was impacted by lower natural gas prices during the period compared to natural gas prices in 2014.[23]

35. This $587 million reduced in wholesale electricity revenues was only offset to a relatively minor extent by a $48 million reduction in the cost of fuel for the lignite/coal facilities (reflecting the lower generation volumes partially offset by higher lignite mining costs and the use of more western coal in the fuel blend) plus some unspecified, but probably minor, non-fuel operating cost savings.[24]

36. ERCOT's own reports similarly reflect that low energy market prices have led to the seasonal mothballing of coal-fired EGU capacity. Specifically, in its own analysis of the impacts of environmental regulations, which specifically included EPA's regional haze plan for Texas and Oklahoma, ERCOT noted that since 2011, it has observed "the seasonal mothballing of almost 2,000 MW of coal capacity . . . due primarily to lower wholesale power prices, and ***not environmental regulations***."[25]

---

[23] EFH SEC Form 10-K at 56.

[24] *Id*.

[25] ERCOT, *Impacts of Environmental Regulations in the ERCOT Region* (Dec. 6, 2014) at 3.

## F. The Financial Value of Texas U.S. Coal-Fired EGUs Has Declined Significantly Since 2008.

37. The fundamental market forces and factors I have discussed have led to dramatic declines in the values of the U.S. coal fleet in general, and the Texas coal fleet in particular. For example, in 2015, Energy Futures Holdings took an impairment of $2.541 billion for its Big Brown, Martin Lake, Monticello, Sandow 4 and Sandow 5 lignite/coal plants and related mining facilities. According to the company, this write off was the "result of impairment factors related to the continued decline in forecasted wholesale electricity prices in ERCOT."[26] This decline in value was completely independent of the regional haze rule. It followed Energy Futures Holdings' 2014 write off of $4.640 billion of the value of the Martin Lake, Monticello and Sandow 5 and related mining facilities.[27]

38. In fact, Luminant has been heavily dependent on coal-fired generation for many years, having bet extensively on high gas and clean energy prices in making its strategic investment decisions.[28] On April 29, 2014 the parent company of

---

http://www.ercot.com/content/news/presentations/2014/Impacts%20of%20Environ mental%20
Regulations%20in%20the%20ERCOT%20Region.pdf.

[26] Energy Future Holdings Corporation SEC Form 10-K filing for the Fiscal Year Ended December 31, 2015, at page 103.

[27] *Id*.

[28] Ken Silverstein, *Big gamble felled Energy Future Holdings. Safe bet could resuscitate it*, The Christian Science Monitor (May 2, 2014) ("'It teaches a lesson, which is using debt to make a bet on gas prices is unwise,' says Bob Bellemare, chief operating officer of consulting firm Mykrobel in New Mexico, in an

Luminant, Energy Future Holdings, conceded it had lost that bet when it filed for bankruptcy because of low power prices making its coal fleet uneconomic.[29] This is one of the largest bankruptcies in U.S. history.[30] Notably, when the Titus County Appraisal Review Board recently appraised the entire Monticello plant (including Unit 3) at $341 million for tax purposes, Luminant argued for an appraisal of just $50 million.[31]

39. NRG Energy also has recently recorded substantial impairments in the value of its Limestone and W.A. Parish coal plants in Texas:

> During the fourth quarter of 2015, as the Company revised its fundamental view for long term prices in connection with the preparation of its annual budget, it was noted that the cash flows for the Limestone and W.A. Parish coal fired facilities and the Gregory combined cycle facility located in Texas were lower than the carrying amounts, primarily driven by declining power prices as the cost of commodities continues to decline. As a result of these updates and in connection with the preparation of the year-end financial statements, the Company determined that the assets are impaired. The Company measured the impairment loss as the difference between the carrying

---

interview. 'They bet and they lost and this is the aftermath.'"), *available at* http://www.csmonitor.com/Environment/Energy-Voices/2014/0502/Big-gamble-felled-Energy-Future-Holdings.-Safe-bet-could-resuscitate-it.

[29] Energy Future Holdings, Restructuring: Information for TXU Energy Customers, https://www.energyfutureholdings.com/restructuring/information-for-txu-energy-customers/ (last visited Dec. 6, 2015).

[30] Jim Malewitz, *Massive Bankruptcy Tests Texas Utility Regulators*, The Texas Tribune (Aug. 28, 2015), *available at* http://www.texastribune.org/2015/08/28/mammoth-bankruptcy-deal-looms-texas-utility-regula/.

[31] Marcia Davis, *Board stands ground on plant appraisal*, The Daily Tribune (July 1, 2015), *available at* http://www.dailytribune.net/news/board-stands-ground-on-plant-appraisal/article_4808f3fa-2041-11e5-9ec6-fbbde6d434de.html.

> amount and the fair value of the assets and recognized impairment losses of $1,514 million, $1,295 million and $176 million related to Limestone, W.A. Parish, and Gregory, respectively.[32]

40. Thus, the power plants regulated by this haze rule, including the Monticello, Martin Lake, and Limestone EGUs, have been under severe financial and economic stress for years, even before EPA's haze rule was finalized.[33]

## G. <u>Petitioners' Doomsday Predictions Have Been Consistently Wrong.</u>

41. Petitioners' dire predictions about the impacts of EPA's regional haze plan are nothing new. Indeed, ERCOT and the same utilities who allege the rule will result in system-wide retirements and reliability failures have repeatedly, and erroneously, made the same predictions in the face of other environmental regulations, including the Mercury and Air Toxics Standards, the Cross State Air

---

[32] NRG Energy, Inc. SEC Form 10-K Filing for the Fiscal Year Ended December 31, 2015, at page 107.

[33] Similarly, Mr. Vandiver, the Vice President of Sales & Marketing Powder River Basin coal for Peabody Coal, asserts that Peabody anticipates a $25 million loss in revenue from Luminant in 2016 as a result of EPA's regional plan. Vandiver Decl. ¶ 14. Because the rule does not require compliance until 2019, however, his assertions about harm are speculative, at best. In any case, Peabody's declining 2016 sales revenue is a function of the downward trend in U.S. coal-fired EGUs generally, not the regional haze rule. In its 2015 SEC Form 10k filing, Peabody warned that it may seek bankruptcy protection as a result of its significant debt and "continued uncertainty around global coal fundamentals, the stagnated economic growth of certain major coal-importing nations." Peabody Energy Corp., SEC Form 10-K Filing for the Fiscal Year Ended December 31, 2015, http://www.sec.gov/Archives/edgar/data/1064728/000106472816000157/btu-20151231x10k.htm#s35EED39A070F249749592996C73A1813.

Pollution Rule, and the Clean Air Interstate Rule. Those predictions have generally failed to materialize.

42. In fact, in 2011, when EPA put forward the Cross State Air Pollution Rule, which also aimed to reduce sulfur dioxide from the same plants subject to the regional haze rule, the State of Texas and Luminant both predicted the new standard would jeopardize reliability, increase wholesale and retail electricity prices, and "imperil" hundreds of jobs.[34] After Luminant and other companies successfully delayed the implementation of that rule for several years, in part by alleging the very same harms they allege here, the rule finally went into effect in January 2015. Notably, none of Luminant's dire predictions about that rule have come to pass.

43. As noted above, Luminant ultimately did decide to shutter two of the units at Monticello and one of the units at Martin Lake for most of the year because the units were uneconomic, not because of the Cross State Rule.

44. As these examples show, petitioners' declarants' doomsday account of the impacts of EPA's regional haze rule for Texas and Oklahoma do not stand up to the facts. Many of the units subject to the rule are already uneconomic. This is the result of factors other than the EPA's regional haze plan for Texas and Oklahoma.

---

[34] *See, e.g.*, Press Release, Attorney General of Texas, Texas Attorney General Greg Abbott Challenges EPA's Flawed Cross-State Air Pollution Rules (Sept. 22, 2011), https://texasattorneygeneral.gov/oagnews/release.php?id=3857.

**H.      Staying the Rule Will not Reverse or Substantially Alter the Current Negative Trends Affecting Coal-Fired Power Plants in Texas.**

45.      The industry's present financial problems are largely attributable to market factors and economic trends that predate the regional haze rule for Texas and Oklahoma, and are expected to continue and affect the coal-fired energy industry for the foreseeable future.  A stay of the rule for the period of time it will take this Court to review its legality (which I assume would be on the order of six to nine months) would have little to no effect on these factors.  There is accordingly no merit to the coal industry's claims that a stay is needed to alleviate, or would effectively alleviate, any irreparable harm to their economic interests.  Looking beyond the stay period, it is also too early to say how individual coal companies will perform under the rule, because there are so many other factors in play, and compliance with EPA's rule does not begin until 2019, for some units, and 2021, for others.

46.      Petitioners' suggestions that the regional haze rule for Texas and Oklahoma has caused them economic harm because they must continue to make day-to-day business decisions without knowing whether the rule will ultimately be upheld.  A stay will not answer that question, so it will not alleviate the complained-of uncertainty. Having to make business decisions without being certain about their long-term financial consequences is inherent in running a capital-intensive business

with long investment horizons in a dynamic and complex marketplace. This is not a new challenge for coal-fired EGU operators, or one that a stay can alleviate.

47. Petitioners' argument that the rule requires substantial costs in the coming months to begin the preliminary scrubber design and planning process similarly falls flat. *See, e.g.*, Carstens Decl. ¶¶ 3, 14. Petitioners suggest that Luminant—the owner of Big Brown, Monticello, Martin Lake, and Sandow 4—will be required to spend approximately $1.5 million in design planning costs over the next six months, and up to $65 million over the next twelve in the absence of a stay. *Id*. ¶ 3. Those costs, however, are insignificant relative to the total operating revenues of the company. In 2015, for example, Energy Future Holdings' total operating revenue was more than $5.3 billion.[35] Thus, over the period of time that it will take this Court to review the rule (which could be in as few as six months), Luminant's planning costs will be a mere 0.02 percent of the company's operating revenue. If this Court's review takes 12 months, Luminant's planning costs could approach 1.22 percent of the company's annual operating revenue.

48. Several of Petitioners' declarants in support of the stay motions seem to acknowledge the inherent uncertainty for their businesses face. In light of industry-wide trends in Texas, a stay alone cannot remove uncertainty and therefore will have

[35] EFH 2015 SEC Form 10-K at page 34, https://www.energyfutureholdings.com/wp-content/uploads/2014/10/EnergyFutureHoldings_10K_20160301.pdf.

little to no practical effect on their financial performance and prospects. If anything, a stay could *deepen* the kind of uncertainty concerning how these plants will operate—for example, by encouraging certain the utilities and the state regulators to defer resource and transmission reliability planning.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6th day of April, 2016.

David Schlissel

**DECLARATION OF GEORGE THURSTON**

I, George Thurston, declare:

1. I am a Professor of Environmental Medicine at the New York University ("NYU") School of Medicine. I previously submitted a report in support of Sierra Club and National Park Conservation Association's ("NPCA's") comments on the proposed regional haze rule for Texas issued by the U.S. Environmental Protection Agency ("EPA") in December 2014, and I make this declaration in response to a motion to stay the final regional haze rule for Texas issued by EPA on January 5, 2016. *See Approval and Promulgation Approval and Promulgation of Implementation Plans; Texas and Oklahoma; Regional Haze State Implementation Plans; Interstate Visibility Transport State Implementation Plan to Address Pollution Affecting Visibility and Regional Haze; Federal Implementation Plan for Regional Haze*, 81 Fed. Reg. 296 (Jan. 5, 2016). This declaration is based on my personal knowledge and opinions which I am qualified to provide based on my education, training, and extensive experience in human health effects of air pollution.

2. I have a Bachelor of Science degree in Engineering from Brown University and a Masters and Doctorate of Environmental Health Sciences from the Harvard University School of Public Health. I have over 25 years of experience in the evaluation of the human health effects of air pollution. I have

served on the EPA's Clean Air Scientific Committee that advises the agency on the promulgation of ambient air quality standards from 2007 to 2010, and I have served on the National Academy of Science's Committee on the Health Effects of Incineration from 1995 to 1999. I have published extensively regarding the health effects of inhaled air pollutants on humans, particularly as it relates to asthma attacks, hospital admission, and mortality, in prominent scientific journals, such as *The Journal of the American Medical Association* (JAMA). I have also been called upon by both the U.S. House of Representatives and the U.S. Senate on multiple occasions in recent decades to provide testimony before them regarding the health effects of air pollution.

4. In support of Sierra Club and NPCA's comments EPA's proposed regional haze rule for Texas and Oklahoma, I submitted a report documenting the adverse human health effects that are associated with exposures to air pollutants from fossil fuel-fired utility power plants generally and, in particular, on the adverse human health effects that will be avoided by the application of EPA's proposed sulfur dioxide ("$SO_2$") emission limits for 14 individual electric generating units ("EGUs") at seven power plants in Texas.[1] On January 5, 2016, EPA issued a final regional haze plan for Texas and Oklahoma, which is

[1] EPA also proposed to require the San Miguel power plant to meet a reduced $SO_2$ emission limit. 79 Fed. Reg. at 74,822. Because that facility recently upgraded its $SO_2$ pollution control equipment and is currently meeting EPA's proposed limit, that facility was not included in my analysis.

substantively identical to the proposed rule. It requires the same power plants to achieve the same emission rates as in the proposal, and, therefore, my conclusions in my prior report on the proposed rule remain valid.

5. The adverse health consequences of breathing air pollution from sources such as coal-fired EGUs are well documented in the published medical and scientific literature. Medical research examining air pollution and public health has shown that air pollution is associated with a host of serious adverse human health effects including: decreased lung function (a measure of our ability to breathe freely), more frequent asthma symptoms, increased numbers of asthma and heart attacks, more frequent emergency department visits, additional hospital admissions, and increased number of deaths.

6. The EPA-approved Environmental Benefits Mapping and Analysis Program ("BenMAP") is a Windows-based computer program that uses a Geographic Information System (GIS)-based method to estimate the health impacts and economic benefits occurring when populations experience changes in air quality. Analysts have relied upon BenMAP to estimate the health impacts, and associated economic values, from changes in ambient air pollution at the city and regional scale. It accomplishes this by computing health impact functions that relate a change in the concentration of a pollutant with a change in the incidence of a health endpoint.

7. Using Ben MAP, I estimated the number of adverse health events (such as respiratory symptoms, restricted activity days, work loss days and mortalities) avoided by application of the $SO_2$ emission limits in the final regional haze rule and the associated reductions in fine particulate matter ("$PM_{2.5}$").

8. As shown in Table 1 below, I estimate the total public health-based economic benefits expected as a result of the rule to be over $3 billion per year. That number includes the combined benefits expected in all affected states from application of all of emission limits in the rule. I applied the epidemiological study (*i.e.*, Krewski et al.) that EPA uses to determine $PM_{2.5}$ mortality impacts.

**Table 1. Annual Multi-State Human Health Effects and Monetary Valuations Associated With the $PM_{2.5}$ Air Pollution Avoided by Applying the Federal Implementation Plan for Regional Haze; Oklahoma and Texas**

| | Expected Number Per Year Avoided* | Total Dollar Valuation (2010$)** |
|---|---|---|
| Respiratory Hospital Admissions (Kloog et al., 2012; Zanobetti et al., 2009) | 59 | $1,869,000 |
| Cardiovascular Hospital Admissions (Bell et al., 2008; Peng et al., 2008; Peng et al., 2009; Zanobetti et al., 2009) | 58 | $2,210,910 |
| Acute Bronchitis (Dockery et al., 1996) | 639 | $307,000 |
| Acute Myocardial Infarction, Nonfatal (Pope et al., 2006; Sullivan et al., 2005; Zanobetti et al., 2009; Zanobetti & Schwartz, 2006) | 38 | $4,732,000 |
| Emergency Room Visits (Glad et al., 2012; Mar et al., 2010; Slaughter et al., 2005) | 187 | $80,000[a] |
| Asthma Exacerbation Symptoms (Mar et al., 2004; Ostro et al., 2001) | 12,021 | $694,000 |

| | | |
|---|---:|---:|
| Upper Respiratory Symptoms (Pope et al., 1991) | 11,606 | $386,000 |
| Lower Respiratory Symptoms (Schwartz and Neas, 2000) | 8,140 | $171,000 |
| Minor Restricted Activity Days (Ostro & Rothschild, 1989) | 302,891 | $20,669,000 |
| Work Days Lost (Ostro et al., 1987) | 51,228 | $7,634,000 |
| Chronic Bronchitis (Abbey et al., 1995) | 251 | $110,000,000 |
| Mortality, All Causes (Krewski et. al, 2009) | 316 | $3,021,190,000 |

* Rounded to nearest whole number.
** Rounded to nearest $1000.

9. Table 2 shows the breakdown of health –based economic benefits by state. Table 3 shows the breakdown of health-based economic benefits by power plant. Table 4 shows the breakdown of health-based economic benefits experienced by major metropolitan area.

**Table 2. State-By State Total Valuation of Annual Health Benefits of EPAProposed FIP Applied to the Seven Power Plants At Issue* (Applying Krewski et al., 2009 for mortality)**

| State | Total Dollar Valuation (2010$)** |
|---|---|
| AR | $175,816,000 |
| CO | $6,512,000 |
| IL | $121,183,000 |
| KS | $112,378,000 |
| LA | $117,847,000 |
| MS | $47,128,000 |
| MO | $202,471,000 |
| NM | $11,314,000 |
| OK | $327,701,000 |
| TX | $2,047,591,000 |
| Total | $3,169,941,000 |

* Big Brown, Coleto Creek, Limestone, Martin Lake, Monticello, Sandow, Tolk

** Rounded to nearest $1000.

**Table 3.  Plant-By Plant Total Valuation of Annual Health Benefits of EPA Proposed FIP (Applying Krewski et al., 2009 for mortality)**

| Electric Generating Station | Total Dollar Valuation (2010$)** |
|---|---|
| Big Brown | $927,440,000 |
| Coleto Creek | $253,765,000 |
| Limestone | $248,613,000 |
| Martin Lake | $690,304,000 |
| Monticello | $681,602,000 |
| Sandow | $278,718,000 |
| Tolk | $89,501,000 |

** Rounded to nearest $1000.

**Table 4. Total Valuation of Annual Health Benefits of EPA Proposed FIP for Selected Metropolitan Areas (Applying Krewski et al., 2009 for mortality)**

| City | Total Dollar Valuation, 7 EPA FIP Plants (2010$)** | Total Dollar Valuation, All 9 Plants (2010$)** |
|---|---|---|
| **Houston, TX** (Brazoria, Chambers, Fort Bend, Galveston, Harris) | $260,754,000 | $536,347,000 |
| **Dallas, TX** (Collin, Dallas, Ellis, Rockwall) | $412,050,000 | $508,469,000 |
| **Ft. Worth, TX** (Johnson, Tarrant) | $205,968,000 | $252,098,000 |
| **Tulsa, OK** (Creek, Osage, Tulsa, Wagoner) | $67,054,000 | $83,925,000 |
| **Oklahoma City, OK** (Canadian, Cleveland, Logan, Oklahoma) | $75,099,000 | $92,620,000 |
| **Chicago, IL** (Cook, DuPage, Kendall, McHenry, Will) | $72,737,000 | $90,213,000 |
| **St. Louis, MO/IL** (Madison, Monroe, St. Clair; Jefferson, St. Charles, St. Louis, St. Louis City) | $65,685,000 | $82,780,000 |
| **Denver, CO** (Adams, Arapahoe, Broomfield, Denver, Douglas, Jefferson) | $2,742,000 | $2,996,000 |

** Rounded to nearest $1000.

10. These overall health impact counts and their dollar valuations are conservative for a number of reasons: (a) they reflect a low estimate of both mortality effects and benefits; (b) additional health benefits from co-reductions in other pollutants (*e.g.*, gaseous $SO_2$) are not included; (c) health impact studies or dollar valuation are not available for many health outcomes thought to be

adversely affected by air pollution (such as effects of air pollution on birth outcomes); and (d) recent scientific study indicating that fine particulate matter created by coal combustion has a higher toxicity "per pound" of particle pollution than the average particulate matter toxicity used in EPA's approved BenMAP model.[2]

11.    While all air pollution control costs associated with the rule can be estimated, estimates of the health benefits of the rule and their monetary valuations are available for only a subset of likely health impacts.  Therefore, my analysis is very conservative and likely underestimates the health and monetary benefits of the rule.

12.    Additionally, based on my review of the Texas Department of State Health Service's 2014 Texas Asthma Burden Report (Dec. 2014)[3], certain communities in Texas have a higher prevalence of asthma and asthma-related mortality that others. According to that report, African Americans living in Texas have a higher prevalence of asthma and are more than two times as likely to die from asthma-related causes than other races.[4]  Also, the Dallas Fort Worth urban area is directly affected by pollution from several of the power plants subject to the rule as shown

---

[2] *See* Thurston et al., *Ischemic Heart Disease Mortality and Long-Term Exposure to Source Related Components of U.S. Fine Particle Air Pollution*, ENVTL. HEALTH PERSPECTIVES (Nat'l Inst. of Envtl. Health Servs. Dec. 2015), http://ehp.niehs.nih.gov/15-09777/.
[3] https://www.dshs.state.tx.us/asthma/pdf/2014BurdenRpt.doc.
[4] Texas Dep't of State Health Servs., 2014 Texas Asthma Burden Report at 20 (Dec. 2014), https://www.dshs.state.tx.us/asthma/pdf/2014BurdenRpt.doc.

in Table 4 and has more than twice the overall prevalence of asthma than the state average.[5] Because this analysis was conducted on a county-by-county population weighted basis, I conclude that those populations with a higher baseline prevalence of disease would have greater impacts per 1000 population. Thus, I conclude that a delay in the implementation of EPA's controls will have a greater impact on African-American and urban populations.

13. The health benefits expected from the rule and their valuations accrue each and every year the pollution controls are operational. That means that ten years from the compliance date, the health benefits and valuations will be roughly ten times the values provided in Tables 1 through 4 (before adjustment for a discount rate and future affected population growth, as appropriate).

14. Similarly, the health benefits and valuations are lost each and every day that rule is delayed. Even a delay of just a few months carries the risk of substantial, and irreparable, harm to public health. For example, a delay of six months would result in 158 deaths that would be avoided with the application of the rule. Furthermore, the public health impacts associated with the delay of the rule have a quantifiable adverse economic impact.

[5] *Compare id*. at Fig. 1-3 *with* Fig. 1-6.

15. Any delay of the rule will only exacerbate the substantial, and irreparable, harms to public health that have already been incurred to date by operation of these coal-fired EGUs without pollution controls.

I, George D. Thurston, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 31st day of March, 2016.

Dr. George D. Thurston, Sc.D.

Declaration of Vik Verma, Chair, The SIGNS Initiative (Safe and Inviting Green Neighborhoods, Longview, Texas)

I, Vikas Verma, declare:

1. I am personally familiar with the facts stated in this declaration and, if called upon, would competently testify to them.

2. I have lived in Texas for 20 years and in Gregg County for 18 years. I live in the town of Kilgore, Texas, approximately 15 miles southwest of Longview.

3. I am Chair of the SIGNS Initiative, located in the City of Longview, East Texas. SIGNS stands for Safe and Inviting Green Neighborhoods and is a joint partnership of Working Effectively for Clean Air Now (WeCAN), the Longview chapter of the National Association for the Advancement of Colored People ("NAACP"), and Organizing for Action – East Texas. SIGNS also serves as the NAACP's environmental justice initiative in Longview.

4. The overall mission of SIGNS is to create a more environmentally just, sustainable, and resilient East Texas through education, community organizing, and advocacy. Our recent efforts have focused on community-based solar and climate preparedness. Geographically, we have a particular focus on South Longview—a predominantly African American and Latino community—where we are building a movement to create an EcoDistrict to advance these goals (see http://ecodistricts.org/).

5. SIGNS and its members support the regional haze rule at issue in this case because we are very interested in seeing the pollution in East Texas begin to be cleaned up by the parties responsible for the pollution.

6. I have long been aware of, and concerned about, the large amounts of air pollution released by the numerous coal-fired power plants in this area, several of which are impacted by this rule. I am aware that the Texas plants impacted by this rule annually emit almost as much sulfur dioxide as the states of Oklahoma, Arkansas, and Louisiana combined, and do not have modern pollution controls for sulfur dioxide.

7. The closest plants to Longview that would need to clean up in response to this rule are the Monticello plant in Titus County and the Martin Lake plant near Henderson, Texas. The Monticello plant is about an hour and fifteen minutes north, and the Martin Lake plant is just half an hour south of Longview. Anything that will mean less pollution from these plants will benefit the health and welfare of ordinary people in East Texas. These plants were built in the late '70s. I am aware that Monticello Units 1 and 2 have no sulfur dioxide scrubbers, and Martin Lake's scrubber is not up to modern standards.

8. These plants each burn many millions of tons of coal per year. It is frightening to know that waste gas leaves the plant without being "scrubbed."

9. I am very concerned about air pollution's impact on my health and the health of others in the community. East Texas is already overburdened by air pollution before the sulfur dioxide and other harmful pollution from these coal power plants are added in. In South Longview, for example, residents also breathe air pollution from the Eastman Chemical plant and a fire rescue training facility. When trainings are going on, many residents of South Longview, particularly the elderly, must stay indoors or wear respirators. Part of SIGNS' interest in this rule is that clean air is a key part of a "safe and inviting green neighborhood." You cannot build an inviting and healthy community when some of the worst polluting plants in the nation are here. If these plants were to put on modern pollution controls, that would be a major step forward in attracting residents and businesses to the area.

10. Communities of color often face disproportionate impacts from pollution, and coal plants are no exception. In its "Coal Blooded" report, the NAACP gave the Martin Lake plant an environmental justice performance ranking of "D+" and the Monticello plant a "C+" based on their impacts on nearby communities of color and low-income communities.

11. SIGNS is currently working to advance more renewable energy development and options to purchase renewable energy in East Texas, including an effort to develop community solar at a federally qualified health center. We see great potential for solar development in East Texas because of the very strong solar resources. Another reason we are focused on renewable energy is that East Texas is currently very dependent on oil and gas development. Adding renewable energy jobs would significantly diversify the area's economy. And according to reports by the U.N. in 2015 and the Political Economy Research Institute at the University of Massachusetts in 2014, investments in renewable energy produce more jobs per dollar than investments in fossil fuel generation or retrofits.

12. We are also working to help meet electricity customers' demand for renewable energy options in East Texas because renewable energy options have become cheaper than those based on fossil fuels. Just last September, we saw Luminant—the owner of the Martin Lake and Monticello plants—sign a long-term contract to buy power from a SunEdison solar facility because it was the most economically competitive option. Luminant will resell the power into the grid. SIGNS tries to bring these savings to low-income communities directly through community solar.

13. The regional haze rule will help make the air in East Texas safer for people to breathe. A stay of the regional haze rule would further delay much needed pollution reductions. And by requiring emission limits that reflect the latest technology, it will force coal plants to stop cutting corners at the cost of people's

health and allow renewable energy to compete on a level playing field. For these reasons, I believe that a stay of the regional haze rule is unjustified and would be harmful to the public interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6th day of April, 2016, in Longview, Texas.

Vikas Verma

Vikas Verma